# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                   No. CR 19-2322 JB

RYAN CHRISTIAN DELORME,

      Defendant.

## AMENDED[1] MEMORANDUM OPINION AND ORDER[2]

**THIS MATTER** comes before the Court on the Motion to Dismiss Indictment, filed September 29, 2022 (Doc. 46)("MTD"). The Court held a hearing on the MTD on November 7, 2022. See Clerk's Minutes at 1, filed November 7, 2022 (Doc. 51)("November 7 Clerk's Minutes"). The Court held a Status Conference on March 29, 2023, during which the Court heard additional arguments regarding the MTD. See Clerk's Minutes at 1, filed March 29, 2023 (Doc. 56)("March 29 Clerk's Minutes"). The primary issues are: (i) whether 18 U.S.C. § 4241(d)'s four-month time period for hospitalization begins when a defendant enters the Attorney General's custody, or when the defendant is hospitalized, and, accordingly, whether a violation of

---

[1]The Court files this Amended Memorandum Opinion and Order to fix a typographical error on page 44 of the originally filed Memorandum Opinion and Order.

[2]In its Sealed Memorandum Opinion and Order, filed August 24, 2023 (Doc. 57)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court publishes a public version. See Sealed MOO at 1 n.1. The Court gave the parties 14 calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

§ 4241(d) has occurred in Delorme's case; (ii) whether the transport delays Delorme has experienced rise to the level of a violation of his due process rights; and (iii) whether dismissing an indictment or expediting a defendant's transport are appropriate remedies for a transport delay that constitutes a violation of § 4241(d) or a defendant's due process rights.  The Court concludes that: (i) Section 4241(d)'s plain language indicates that the four-month time period begins to run when a defendant is hospitalized and, accordingly, no violation of § 4241(d) has occurred in Delorme's case; (ii) the delays Delorme has experienced do not rise to the level of a due process violation, because the time he has spent awaiting transport, while unfortunate, is reasonably related to effectuating his hospitalization under Jackson v. Indiana, 406 U.S. 715 (1972)("Jackson"); and (iii) dismissing a case against a defendant or expediting the defendant's transport would be an inappropriate and unworkable use of the Court's supervisory power.  Accordingly, the Court denies the MTD.

## PROCEDURAL BACKGROUND

The Court details the procedural history of Delorme's MTD.  The Court begins by summarizing the Indictment, filed July 25, 2019 (Doc. 2).  The Court then provides the background relevant to Delorme's psychiatric examination.  Finally, the Court summarizes the MTD; the November 7, 2022, hearing; Delorme's Supplemental Memorandum in Support of Motion to Dismiss Indictment (Doc. 46), filed March 21, 2023 (Doc. 54)("Supplement"); and the March 29, 2023, status conference.

1.    **The Indictment**.

The Grand Jury indicted Delorme on July 25, 2019.  See Indictment at 1.  The Indictment charges Delorme with aggravated sexual abuse of a minor in Indian Country, in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(A).  See Indictment at 1.  Specifically, the Indictment

alleges that "Delorme, an Indian, unlawfully and knowingly engaged in and attempted to engage in a sexual act by force" with a child who was between twelve and sixteen years of age and at least four years younger than Delorme.  Indictment at 1.

2.      **Delorme's Psychiatric Examination.**

On March 10, 2021, Delorme submitted the MDC.  See MDC at 1-3.  In the MDC, Delorme asserts that there is "reasonable cause" to conclude that he is "suffering from a mental disease or defect rendering him mentally incompetent."  MDC ¶ 1, at 1.  Delorme contends that he is unable to assist properly in his own defense and harbors delusions about his charged conduct and confinement conditions.  See MDC ¶ 1, at 1.  Delorme requests a local psychiatric examination and hearing on the issue of competency pursuant to 18 U.S.C. § 4241.  See MDC at 2-3.

On August 23, 2021, the Court granted the MDC, noting that it was unopposed.  See **Sealed** Order for Mental Competency Examination Pursuant to 18 U.S.C. 4241 at 1, filed August 23, 2021 (Doc. 35)("Examination Order").  The Court committed Delorme to the Attorney General's custody "for a reasonable period not to exceed thirty days," in order for the Attorney General to confine Delorme in a hospital or psychiatric facility and perform a psychiatric examination.  Examination Order at 1.  The Court specified that the Attorney General send Delorme to the "suitable hospital or psychiatric facility closest to the court[,] unless impracticable."  Examination Order at 1.

In keeping with the Examination Order, the Attorney General committed Delorme to the Federal Detention Center in Seattle-Tacoma, Washington ("SeaTac"), on December 7, 2021.  See Letter from I. Jacquez to the Court (dated January 7, 2022), filed January 17, 2022 (Doc. 37)("Letter").  SeaTac's warden, Israel Jacquez, informed the Court that, while Delorme's psychiatric examination ordinarily would have started immediately after his arrival at SeaTac, the

"Bureau of Prison's [sic] COVID-19 action plan requires all new arrivals to be quarantined for approximately 20 days for enhanced medical screening.  The evaluation cannot commence until defendants have cleared the medical screening."  Letter at 1.  Jacquez indicated that, at the time of Delorme's admission to SeaTac, the facility was under modified operations that impacted its ability to conduct examinations under a normal timeframe.  See Letter at 1.  A "significant surge in COVID-19 infections" increased the delay, given that Jacquez issued a "Shelter in Place" order that prevented psychologists from "meet[ing] with the defendant for purposes of this evaluation."  Email from Cynthia Low, Ph.D., to the Court (dated January 12, 2022), filed January 17, 2022 (Doc. 38).

Delorme underwent a competency examination on April 7, 2022, which resulted in the production of an Evaluation.  See Forensic Evaluation at 3 (dated April 8, 2022), filed April 25, 2022 (Doc. 40)("Evaluation").  The Evaluation describes Delorme as "polite and cooperative," but indicates that he exhibits "excessively detailed, rambling, and tangential" speech which is "mostly about delusional material."  Evaluation at 11.  The Evaluation determines that Delorme's "credibility was not sound," because, during the interview process, "he made many delusional statements and continually reverted back to topics about his delusional beliefs."  Evaluation at 4.  Some of these delusions revolve around Delorme's case.  See Evaluation at 14.  Delorme expresses a belief that he was "set up" and that several people were "in cahoots to frame [him] . . . because they could."  Evaluation at 14 (quoting Delorme).  The Evaluation determines that Delorme's delusions would impact his ability to participate in his defense, and that he has "a poor ability to properly assist counsel."  Evaluation at 14.  The Evaluation bases this conclusion in part on the fact that Delorme expresses a desire to disregard his attorney's advice, because his attorney will not investigate the "premediated conspiracy" to put Delorme in jail.  Evaluation at 14.  The

Evaluation diagnoses Delorme with "Delusional Disorder, Persecutory type"[3] and recommends "[f]ormal competency restoration procedures at a federal medical center" to determine if he would be able to gain competency.  Evaluation at 14-15.

On June 9, 2022, the Court held a status conference in which the parties expressed their agreement that the Court should order that Delorme be transferred to a federal medical center in order to receive additional treatment.  See Clerk's Minutes at 1-2, filed June 9, 2022 (Doc. 45). Following the status conference, based on the Evaluation's recommendation and pursuant to 18 U.S.C. § 4241, the Court committed Delorme to the Attorney General's custody to be transported to a Bureau of Prisons ("BOP") medical facility, "to complete further treatment to determine whether Defendant's disorder can be treated with medication," and, if so, whether "compulsory medication is required to restore Defendant to competency."  Sealed Stipulated Order for Further Mental Competency Treatment and Restoration to Competency Pursuant to 18 U.S.C. 4241 at 2, filed June 21, 2022 (Doc. 44)("Further Treatment Order").  The Court noted that, "[i]f the Defendant is amenable to competency treatment without compulsory medication, the Defendant will reside at the facility 'for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future, he will attain the capacity to permit the proceedings to go forward.'"  Further

---

[3]The Evaluation diagnoses Delorme "[o]n the basis of the available information . . . according to the criteria in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)."  Evaluation at 12.  Delorme's diagnosis' essential characteristic is "the presence of one or more delusions with a duration of one month or longer." Evaluation at 12.  Delusional Disorder, Persecutory type is a "common subtype" of delusional disorder, which "includes the belief that the person (or someone to whom the person is close) is being malevolently treated in some way," and which causes some patients to  "believe that they have been drugged, spied upon, harmed, [or] harassed" or "seek 'justice' by making reports, taking action     or     even     acting     violently."     Delusional   Disorder,   Wikipedia, https://en.wikipedia.org/wiki/Delusional_disorder (last visited August 10, 2023).

Treatment Order at 2 (quoting 18 U.S.C. § 4241(d)).  The Court stated that, if providers at the medical center determine that Delorme is able to be restored to full competency to the extent that he "['] is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense,'" then the Court will hold a hearing to ascertain if Delorme is competent enough to stand trial or to engage in other proceedings.  Further Treatment Order ¶ 3, at 3 (quoting 18 U.S.C. § 4241(a)).  The Court noted that, if the Court were to find by a preponderance of the evidence that Delorme regained full competency, it "shall order his immediate discharge from the facility in which he is hospitalized and shall set the date for trial or other proceedings," Further Treatment Order ¶ 3, at 3, but, if it were to determine "that there is not a substantial probability in the foreseeable future" that Delorme will gain full competency, an evaluation of whether Delorme is dangerous under 18 U.S.C. §§ 4246 or 4248,  must proceed, Further Treatment Order ¶ 4, at 3.  The Court notes that, "[p]ursuant to 18 U.S.C. § 3161(h)(1)(A)[,] the period of time from the filing of Defendant's Unopposed Motion to Determine Mental Competency to the entry of an order finding Defendant competent is EXCLUDED for purposes of calculating Defendant's speedy trial rights."[4]  Further Treatment Order at 3.

   **3.     Delorme's MTD.**

   Three months after the Court entered the Further Treatment Order, on September 29, 2022, Delorme filed his MTD.  See MTD at 1-7.  Delorme contends that he has spent "over a year and a

---

   [4]18 U.S.C. § 3161, the first section of the Speedy Trial Act, 18 U.S.C. §§ 3161-74, requires that a trial begin within seventy days of the indictment filing date or the defendant's first appearance, whichever is later.  See 18 U.S.C. § 3161(c)(1).  In "computing the time within which the trial of any such offense must commence," any "delay resulting from any proceeding, including any examinations to determine the mental competency or physical capacity of the defendant," is excluded.  18 U.S.C. § 3161(h)(1)(A).

half in custody" since filing his MDC.  MTD at 1.  He alleges that "the Government has delayed

the proceedings far outside of the permissible ranges set by Congress."  MTD at 1.  Delorme details

his timeline:

> **March 10, 2021**, Mr. Delorme filed his Unopposed Motion to Determine Competency.  (Doc. 31)
>
> . . . .
>
> **August 23, 2021**, this Court granted the motion and ordered Mr. Delorme committed to the custody of the Attorney General in a suitable psychiatric hospital to conduct a competency examination and issue a report.  (Doc. 35)
>
> **January 7, 2022**, a letter addressed to the Court from the Bureau of Prisons explained that Mr. Delorme was brought to the Seattle/Tacoma, Washington facility (FDC SeaTac) to determine his competency.  It further explained that Mr. Delorme arrived at the facility on **December 7, 2022**, and that because of COVID, "normal time frames" to complete evaluations had been disrupted.  (Doc. 37)
>
> **April 12, 2022**, Cynthia Low, Ph.D., issued a report filed on April 25, 2022. Writing on behalf of the BOP, FDC SeaTac, Dr. Low opined that Mr. Delorme suffered from a mental disorder that would "substantially impair his ability to assist counsel in his defense," and recommended "formal competency restoration procedures."  (Doc. 40)
>
> . . . .
>
> **June 9, 2022**, this Court held a status conference to discuss the findings of Dr. Low (Doc. 45)[.]  Parties agreed Mr. Delorme was incompetent to proceed.
>
> **June 13, 2022**, a proposed stipulated Order was submitted to the Court by AUSA Novaline Wilson.
>
> **June 21, 2022**, the stipulated Order was filed Ordering the Attorney General to determine if Mr. Delorme's disorder can be treated with medication, and more generally, whether there is a 'substantial probability in the foreseeable future that he will attain" competency, pursuant to 18 U.S.C. § 4241(d)(1).
>
> **September 27, 2022**, U.S. Marshal Service said that the Court's Order was received on June 23, 2022, and Mr. Delorme was designated to Springfield Medical Facility three days later.  Transport to Springfield is scheduled 4-6 months out from the time of designation.

MTD at 2-3 (bold in original).  Delorme contends that his significant time in custody exceeds "[t]he time frames set by statute . . . and in some instances, by extremely wide margins."  MTD ¶ 5, at 4.  As a result, Delorme alleges that the "intent [of the statutes] -- preventing needless delay and the unconstitutional languishing of defendants -- and the stated terms of the statutes, have been violated."  MTD ¶ 5, at 4.  Delorme contends that his prolonged confinement is the result of an "unreasonable delay" which "amounts to the kind of flagrant misconduct warranting dismissal."  MTD  ¶ 5,  at  4 (quoting  United States v. Donnelly,  41  F.4th 1102, 1107  (9th  Cir. 2022)("Donnelly"), and citing United States v. Harris, 997 F.2d 812, 815 (10th Cir. 1993)).

Delorme asserts that the United States violated the time limits Congress has set for competency proceedings in two separate ways.  First, Delorme contends that it took "nearly 8 months" after the Examination Order's entry on August 23, 2021, to complete his psychological examination at SeaTac.  MTD ¶ 8, at 5.  Delorme maintains that the length of time that it took to complete his psychological examination violates the statutory timeframe, which he alleges allows only "commit[ment] to the Attorney General for a period, *not to exceed* 30 days," noting that, in addition, "an extension, *not to exceed* 15 days, could have been granted for good cause."  MTD ¶ 3, at 3 (citing 18 U.S.C. § 4247(b)) (emphasis in MTD, but not 18 U.S.C. § 4247(b)).  Delorme calculates that this leads to a "maximum 45-day window to accomplish this aspect of competency proceedings" and argues that this "45-day window" is a "statutory time-limit that cannot be made flexible or extended by courts."  MTD ¶ 7, at 5 (citing United States v. Carter, 583 F. Supp. 3d 94, 100 (D.D.C. 2022)(Friedrich, J.)).  Delorme alleges that it took "three and a half months" for him to arrive at SeaTac after "the Court Order for commitment to the Attorney General was filed on August 23, 2021."  MTD ¶ 7, at 4-5.  He further argues that, once he was in BOP custody at SeaTac, it took "more than four months before a report was submitted" and that, "[b]y then, the

45-day outer limit had been extended to nearly 8 months." MTD ¶ 8 at 5. Delorme asserts that no action was taken to request an extension of this outer limit, and that, even if the United States had requested an extension, "there would not have been any authority to grant such an extension." MTD ¶ 8, at 5.

Second, Delorme argues that "[d]elay in transporting Mr. Delorme that exceeds the statutorily permissible period of hospitalization flagrantly runs afoul of Due Process, and the Congressional intent and plain letter of 18 U.S.C. § 4241(d)," MTD ¶ 10, at 6, and, accordingly, that the "three-and-a-half month delay to transport Mr. Delorme to BOP custody for initial observation is unacceptable," MTD ¶ 11, at 6. Delorme contends that, when the Court committed him to the Attorney General to be hospitalized "in a treatment facility to determine if there is a substantial probability that he will gain competence in the foreseeable future[, . . . t]hat process is not to exceed four months." MTD ¶ 4, at 3 (citing 18 U.S.C. § 4241(d)(1)). Delorme asserts that, at the time of his MTD's filing, "[o]ver three months have passed since the Court filed the Order directing BOP to determine the likelihood of future competency," and that "[t]he expected delay from the time of designation to transport was estimated to be 4-6 months." MTD ¶ 9, at 5-6. Delorme explains that this delay has caused him "personal torment," including "severe anxiety, sleep deprivation, and constant vigilance." MTD ¶ 12 at 6. Delorme concludes that the fact that "[o]ver a year and a half has passed since competency proceedings were initiated" proves that "the Government has abdicated its interest in going forward on the indictment," and, therefore, "[d]ismissal is appropriate." MTD ¶ 13, at 7.

The United States responds to Delorme's MTD. See The United States' Sealed Response to Defendant's Motion to Dismiss Indictment (Doc. 46), filed October 13, 2022 (Doc. 47)("Response"). In the Response, the United States asserts that Delorme "cannot show that

he is entitled to dismissal of the indictment before his competency restoration" and that, "[t]o the extent Defendant challenges his mandatory restorability under § 4241(d) based on due process . . . [,] the statute is constitutional."  Response at 3-4.  As an initial matter, the United States argues that the four-month time period for hospitalization in § 4241(d) comports with due process, because "[t]his four-month period 'is reasonably related to important governmental purposes justifying such detention.'"  Response at 4 (quoting United States v. McKown, 930 F.3d 721, 728 (5th Cir. 2019)).  The United States maintains that this reasonable relation is sufficient to meet the standard for pretrial detention which the Supreme Court of the United States of America articulates in Jackson.  See Response at 4.

Additionally, the United States contends that no violation of § 4241(d) has occurred, because the "four-month custodial hospitalization for competency restoration has not yet started." Response at 5.  The United States argues that "[t]he four-month timeframe begins once a defendant is admitted to a facility for treatment and diagnosis."  Response at 5 (citing United States v. Villegas, 589 F. App'x. 372, 373 (9th Cir. 2015); United States v. Giorella, No. 09-cr-0041-PAB, 2009 WL 4016631 (D. Colo. November 17, 2009)(Brimmer, J.)).  The United States argues that Delorme's reliance on United States v. Carter is misplaced, because that case is distinguishable from Delorme's.  See Response at 6.  The United States elaborates that, in United States v. Carter, "there was a contested competency hearing and discussion before restoration was ordered," and argues that, here, "the parties stipulated to competency restoration."  Response at 6 (citing United States v. Carter, 583 F. Supp. 3d at 94).  The United States argues that the Court "should rely on the plain language interpretation of the text, which states: 'The Attorney General shall hospitalize [the] defendant for treatment in a suitable facility . . . .'"  Response at 7 (quoting 18 U.S.C. 4241(d)).  The United States argues that, as Delorme still is awaiting transport to a suitable facility,

"until he arrives, Defendant has not triggered the initiation of his four-month timeframe for custodial hospitalization."  Response at 5.

      The United States also asserts that there is no due process violation until Delorme is in custody for longer than the minimum mandatory statutory penalty he faces for his accused crime. See Response at 6.  The United States points to United States v. Boigegrain, 122 F.3d 1345 (10th Cir. 1997), stating that, in that case:

> The Tenth Circuit noted that[,] in[] "*United States v.* Ecker, 30 F.3d 966, 969 (8th Cir. 1994), *cert. denied*, 513 U.S. 1064 (1994), the court held that a § 4241(d)(2) commitment for an additional four months following a commitment for four months under § 4241(d)(1) did not violate due process because the total time for commitment to determine competency to stand trial, four years, due to several evaluations being made, was far less than the possible sentence."

Response at 6 (quoting United States v. Boigegrain, 122 F.3d at 1349.  The United States argues that, because Delorme is facing a violation of 18 U.S.C. §§ 1152, 2241(c), and 2246(2)(A), he will be facing a "minimum mandatory statutory penalty of thirty years."  Response at 6.  The United States asserts that, because the minimum mandatory statutory penalty Delorme faces is so large, "his competency restoration timeframe will ultimately be far less than his possible sentence," and, thus, time in custody will not run afoul of due process.  Response at 6.

      Finally, the United States argues that Delorme's "motion to dismiss is premature because he has no right to bypass the first prong of the *Sell*[ *v. United States*, 539 U.S. 166 (2003)("Sell"),] analysis."  Response at 8.  The United States asserts that, "[i]n *Sell*, the Supreme Court considered the circumstances in which a criminal defendant could be involuntarily medicated and treated to competency in order to stand trial.  Four criteria must be met."  Response at 8 (citing Sell, 539 U.S. at 180-81).  The United States asserts that the first of these criteria "requires the United States to show 'that important governmental interests are at stake.'"  Response at 8 (quoting United States v. Valenzuela-Puentes, 479 F.3d 1220, 1223-24 (10th Cir. 2007)).  The United States argues that

a motion to dismiss at this stage is premature, because Delorme has not provided any information indicating that "the amount of time defendant spends in pretrial detention is in parity with an 'expected sentence,'" which would support an argument that "the government may no longer claim a significant interest."  Response at 8 (quoting United States v. Bradley, 417 F.3d 1107, 1116 (10th Cir. 2005)).  The United States argues that, because Delorme has not provided this information, "pretrial detention for restoration of competency is still an important [governmental] interest," and Delorme cannot request dismissal on the basis of "delay, including a pandemic-related delay," alone.  Response at 9.

    **4.      November 7, 2022, Hearing.**

        The Court held a hearing on the MTD on November 7, 2022.  See November 7 Clerk's Minutes at 1.  At the hearing, Delorme reiterated the amount of time he had been held in custody awaiting transport and stated that this delay is problematic, because "Congress is very clear about the timelines that they wanted to [b]e observed."  Draft Transcript of November 7, 2022, Hearing at 5:3-6 (Fernandez)("November 7 Tr.").[5]  The Court agreed that Congress is specific about its timelines, but expressed concern that the statute does not authorize dismissal as a remedy.  See November 7 Tr. at 5:8-15 (Court).  Delorme identified this issue as an "underdeveloped area of law," November 7 Tr. at 5:18 (Fernandez), but asserted that Congress created such specific deadlines, because "they're aware that people who are deemed incompetent are in a sensitive position," November 7 Tr. at 6:20-22 (Fernandez), and, accordingly, there "has to be some limit at which this time becomes unconscionable," November 7 Tr. at 7:2-4 (Fernandez).  The Court questioned what Delorme's timeframe was for transport from Cibola County Correctional Center

_____

        [5]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

to a suitable hospital.  See November 7 Tr. at 7:7-9 (Court).  Delorme responded that his "wait time was four to six months."  November 7 Tr. at 7:14 (Fernandez).  The Court asked if this wait time is "a result of something the marshals are doing or the BOP just not accepting them." November 7 Tr. at 7:24-8:1 (Court).  Delorme answered that he believes "it's BOP[;] I think the marshals, as soon as they can transport them, do."  November 7 Tr. at 8:2-3 (Fernandez).

The Court stated that, according to the statute's plain language, "it doesn't look like the clock runs until the attorney general at the BOP facility gets him."  November 7 Tr. at 8:4-7 (Court).  Delorme argued that the statute is "silent on the issue" and that, because it is silent, "it's for courts to interpret what the means."  November 7 Tr. at 8:8-13 (Fernandez).  The Court asked what would happen if the Court interprets that statute not to give the Court "the power to or authority to dismiss the indictment."  November 7 Tr. at 9:10-12 (Court).  Delorme's replied that it may be appropriate to order "some version of a show case" to "ask Bureau of Prisons what's really happening."  November 7 Tr. at 9:14-16 (Fernandez).  Delorme argued that having a record of what is causing the delay would be useful, "so[,] if it is ever brought up on appeal[,] the record could be clear about what exactly is happening and who created the bottleneck."  November 7 Tr. at 9:20-22 (Fernandez).  The Court pointed out that what Delorme is suggesting is equivalent to starting "contempt proceedings against the BOP."  November 7 Tr. at 10:8-10 (Court).  The Court stated that the delay in transport is a recent development, and that it is unlikely "anybody contemplated" that the defendant would not be moved within "four to six months" after a court order.  November 7 Tr. at 11:10-13 (Court).  Delorme agreed that this delay is out of the ordinary, but maintained that it cannot be that he "and the other similarly situated people have to bear the brunt of that."  November 7 Tr. at 13:18-20 (Fernandez).  Delorme argued that the "need to

accommodate what Congress said is supposed to happen" suggests that "the right response at this sta[ge] is a dismissal." November 7 Tr. at 13:20-22 (Fernandez).

The Court asked the United States for its position on the MTD. <u>See</u> November 7 Tr. at 14:14-15 (Court). The United States indicated that Delorme is number "23 out of the 59 on the list [of individuals awaiting transport]," according to a conversation it had with the United States Marshals Service. November 7 Tr. at 14:18-20 (Wilson). The United States estimated that, based on its conversation with the Marshals, "that it's going to be four months before a designation date at [Medical Center for Federal Prisoners (MCFP)] Springfield," ("MCFP Springfield") and Delorme's move to MCFP Springfield "will happen three or four weeks prior to that date that's designated." November 7 Tr. at 14:24-15:5 (Wilson). The Court asked if the problems causing the delay are related to the pandemic or are "post[-]pandemic problems." November 7 Tr. at 15:15-17 (Court). The United States speculated that the delay results from of "a variety of issues," including "limit[ed] staffing resources and bed availability." November 7 Tr. at 16:15-17 (Wilson). The Court inquired if an additional four months would mean that Delorme would have to wait a total of eight months before Delorme arrives at a facility, and the United States confirmed that schedule is likely. <u>See</u> November 7 Tr. at 16:20-25 (Court, Wilson). The Court stated that having defendants stay "locally incarcerated for eight months," is likely "not what Congress wanted" when it enacted § 4241. November 7 Tr. at 17:1-6 (Court). The United States argued that "a four month period within the [Attorney General's] custody [under 18 U.S.C. § 4241(d)(1)] is when Mr. Delorme would arrive at [a facility,]" and so there has not yet been a violation of the statute. November 7 Tr. at 17:20-23 (Wilson). The United States reiterated the arguments it raises based on <u>Sell</u>, 539 U.S. at 166, that it presents in its Response. <u>See</u> November 7 Tr. at 18:3-25 (Wilson). The Court indicated that basing the acceptable time for Delorme to be held for

competency proceedings on the potential sentence he may face "assumes that he is guilty. And right now he's presumed innocent." November 7 Tr. at 23:24-25 (Court).

The Court noted that it is "inclined to think that the remedy is [not] to dismiss the indictment." November 7 Tr. at 21:16-17 (Court). The Court contrasted § 4241 with the Speedy Trial Act, 18 U.S.C. § 3161, through which Congress created a "statutory scheme and they came up with a remedy, one of which is dismissal of the indictment," and emphasized that the Court is "reluctant . . . to create that sort of remedy scheme that Congress knew exactly how to create and didn't do here." November 7 Tr. at 21:18-22:1 (Court). The Court noted that it does not see a contempt order as an alternate solution, because there is no proper party to hold in contempt. See November 7 Tr. at 22:2-11 (Court). In light of the statute's silence regarding available remedies, the Court asserted "there really may be[,] as a practical matter[,] nothing the Court can do," because determining the proper remedy for violating a statute is "something that the political branches with the purse and resources are going to have to decide." November 7 Tr. at 23:1-5 (Court).

**5.      Delorme's Supplement.**

Four-and-a-half months after the hearing, Delorme filed his Supplement on March 21, 2023. See Supplement at 1-5. In the Supplement, Delorme asserts that "over nine months have passed since this Court first committed Mr. Delorme to the custody of the Attorney General for treatment," and, accordingly, it has now been "more than five months beyond the statutory time limit" and Delorme "has yet to even arrive to [sic] the designated medical facility." Supplement at 2. Delorme contends that this delay -- during which he remains at the Cibola County Correctional Center -- defies the Supreme Court's holding in Jackson, 406 U.S. at 715, and runs afoul of Congress' intent in passing § 4241. See Supplement at 2-4.

First, Delorme asserts that the four-month time limit "represents the judgment of the national legislature" on what counts as a reasonable period time pursuant to the Supreme Court's holding that "an incompetent defendant 'cannot be held for more than the reasonable period of time.'"  Supplement at 2-3 (quoting <u>Jackson</u>, 406 U.S. at 738).  Delorme characterizes the United States' position as proposing that "an incompetent defendant can be held indefinitely until a determination is made that he can or cannot attain competency.  Only then do constitutional time limits come into force."  Supplement at 3.  Delorme argues that this violates <u>Jackson</u>, 406 U.S. at 715, because it holds him for a longer period of time than what Congress has defined as reasonable. <u>See</u> Supplement at 3.

Second, Delorme argues that starting the four-month time limit in § 4241(d)(1) when he arrives at a suitable medical facility contradicts Congressional intent.  <u>See</u> Supplement at 2-4. Delorme argues that Congress did not "envision[] the creation of two separate time periods, the first period of pre-hospitalization commitment subject to no statutory time constraints whatsoever, to be followed by a period of hospitalization subject to a strict four-month time constraint." Supplement at 3 (quoting <u>Donnelly</u>, 41 F.4th at 1108 (Watford, J., concurring)).  To support this argument, Delorme points to the text's language as well as the legislative history.  <u>See</u> Supplement at 3-4.  Delorme asserts that the statue's instruction that "a district court 'shall commit' the defendant to the custody of the Attorney General" and its instruction that "the Attorney General 'shall hospitalize' the defendant for treatment and evaluation for a reasonable period of time not to exceed four months" is "most sensibly read as imposing an outside time limit on the entire period of commitment, from issuance of the court's commitment order to completion of the defendant's period of hospitalization."  Supplement at 3-4 (quoting <u>Donnelly</u>, 41 F.4th at 1108). Delorme contends that this limit is consistent "with the statute's legislative history, 'which makes

no mention of two separate time periods, but instead describes a single period of "commitment under section 4241."'" Supplement at 4 (quoting Donnelly, 41 F.4th at 1108 (quoting S. Rep. No. 98-225, at 236 (1983))). Delorme argues that the statue's text and its legislative history supports the conclusion that the four-month limit applies to time before admission to a suitable medical facility. See Supplement at 4.

Delorme contends that, despite his being in custody "for approximately 42 months and 19 days -- over 24 months of which have passed since counsel first filed [the MDC,] . . . . the competency procedures under 18 U.S.C. § 4241 are not nearly complete." Supplement at 4. Delorme's assertion is that "[t]he only excuse at this point for persistent delay competency proceedings is failure of the BOP to adequately allocate resources to competency evaluations and restorations." Supplement at 4. As a consequence, Delorme argues, he has suffered "prejudice," including "a prolonged deprivation of liberty" and "lack of mental health treatment while Mr. Delorme awaits transport to BOP," which has been "detrimental to Mr. Delorme's already compromised mental health." Supplement at 4-5.

**6.      March 29, 2023, Status Conference.**

The Court held a Status Conference on March 29, 2023, during which the Court heard additional arguments relating to Delorme's Supplement. See March 29 Clerk's Minutes at 1. The Court informed the parties that, according to a conversation with "the US Marshals, the US Marshal and the chief deputy," the primary issue causing the delay is that the BOP "just simply cannot take them" to suitable mental health facilities under § 4241, because "the facilities are full." Draft Transcript of Status Conference at 3:7-18, (taken March 29, 2023)(Court)("March 29 Tr.").[6]

---

[6]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

Delorme indicated that his concern is "twofold."  March 29 Tr. at 4:5 (Carey).  Delorme's first concern is that "the burden [of full facilities] is falling on the most seriously mentally ill defendants."  March 29 Tr. at 4:6-8 (Carey).  Delorme's second concern is "that there are constitutional implications," specifically that, "under the 14th Amendment [to the Constitution of the United States of America] . . . we can't indefinitely hold individuals merely because they're incompetent to proceed to trial."  March 29 Tr. at 4:10-15 (Carey).

Additionally, Delorme contended that allowing this "excessive delay" is "unacceptable for a myriad of reasons" in addition to his constitutional concerns.  March 29 Tr. at 7:25-8:2 (Carey). Delorme characterized "the government's position" as "believ[ing] there's no time limit[] on how long an incompetent defendant can be held while awaiting bed space at a BOP facility."  March 29 Tr. at 8:5-10 (Carey).  Delorme stated that this situation is unacceptable, because "[t]he failure of the government to allocate enough money for staff and bed space at BOP medical facilities has to be borne again by individuals . . . who have serious mental illness."  March 29 Tr. at 8:10-14 (Carey).  Delorme contended that the United States' "position cannot be correct in light of the Supreme Court's decision in Jackson, [or] in light of the plain language of [18 U.S.C. § 4241]." March 29 Tr. at 14-16 (Carey).  Delorme argued that "COVID is no longer an excuse," and that "[t]he delay at this point is entirely attributable to lack of bed space and lack of allocation of funding, which should not fall on [defendants'] shoulders."  March 29 Tr. at 8:22-25 (Carey).

The Court stated that this is an issue "a lot of district judges are concerned about," but pointed out that "nobody's pulled the trigger and decided that they have the power to do much with this."  March 29 Tr. at 9:4-8 (Court).  Delorme responded that, in United States v. Carter, 583 F. Supp. 3d at 94, the Honorable Dabney L. Friedrich, United States District Judge for the United States District Court for the District of Columbia, "order[ed] dismissal of the indictment due to

prehospitalization delay." March 29 Tr. at 9:12-13 (Carey). The Court asserted that there is not "any basis in the statute to [order dismissal,]" as "[t]he fact that the statute for [the S]peedy [T]rial [A]ct[,18 U.S.C. 3161,] gives [the] power to dismiss the indictment suggests . . . [the Court does not] have that power [here.]" March 29 Tr. at 9:21-24 (Court). The Court noted its concern that "the remedy [of dismissal] is not based in anything." March 29 Tr. at 10:4-6 (Court).

Delorme argued that there must be a remedy. See March 29 Tr. at 10:8-9 (Carey). He contended that, under his understanding of § 4241(d)(1), "[t]he government has the burden to show whether [a defendant], who has been deemed incompetent, will have the capacity in the foreseeable future to proceed." March 29 Tr. at 11:1-4 (Court). Delorme argued that, because the United States "has not met that burden in th[e] four-month time period[,] . . . the 4241 proceedings are complete." March 29 Tr. at 11:4-7 (Carey). Delorme continued that, because the proceedings are complete, to "[c]ontinu[e] confinement is inconsistent with Jackson because [t]he government doesn't have [the] authority to detain him." March 29 Tr. at 11:9-12 (Carey). Delorme argued that this "leads to the conclusion that the court must dismiss the matter." March 29 Tr. at 11:13 (Carey). Delorme concluded that it is "inconsistent[,] both with Jackson and the Constitution," to hold him "for an indefinite period of time waiting to get to a bed space." March 29 Tr. at 11:21-24 (Carey).

Delorme pointed to the United States Court of Appeals for the Ninth Circuit's decision in Donnelly, as support for his argument. See March 29 Tr. at 12:13-14 (Carey). Delorme stated that the Ninth Circuit found "that the period of prehospitalization commitment had to bear some reasonable relation to the purpose, and the purpose of [prehospitalization commitment] was to identify an appropriate treatment facility and arrange for the defendant's transportation." March 29 Tr. at 12:17-22 (Carey). Delorme contended that, while the Ninth Circuit in Donnelly "ordered

the [A]ttorney [G]eneral to hospitalize the [defendant] within seven days," because of its "disbelief that . . . the reasonable relation requirement could permit a prehospitalization commitment period longer that what was allowed for the treatment period under [18 U.S.C. § 4241]," the Ninth Circuit "did note that nothing in its decision that day foreclosed the possibility that dismissal could be appropriate at a future date."  March 29 Tr. at 12:17-13:6 (Carey).

The Court asked the United States if it is aware of Delorme's current position on the list for transport to a suitable medical facility.  See March 29 Tr. at 15:4-5 (Court).  The United States responded that it does not know where he is on the list.  See March 29 Tr. at 15:6-7 (Bell).  The Court asked why this is a problem now, as, for at least twenty years, this problem has never appeared "so acutely."  March 29 Tr. at 15:12-14 (Court).  The United States responded that it does not "have enough information to fully answer that question."  March 29 Tr. at 15:16-18 (Bell). The Court pointed out that "federal prisons are lower in population right now [rather] than higher," and asked if this issue is because of a staffing shortage.  March 29 Tr. at 15:20-24 (Court).  The United States presented a tentative explanation based "off of some casual conversation" and stated that "there's a little bit of a tail from COVID that things are backed up, and it's moving through the system."  March 29 Tr. at 16:4-9 (Bell).  The United States also contended that "evaluating for competency restoration" may be experiencing a longer delay than "initial competency evaluations," because competency restoration evaluations require a certified provider "who has the authority to make that sort of assessment and prescribe [medication]."  March 29 Tr. at 16:14-21 (Bell).  The United States stated that the need for a higher level of provider may explain the fact the delay persists as they have experienced "a problem in meeting that need in having enough psychiatrists."  March 29 Tr. at 16:11-12 (Bell).  The United States contends that "the [BOP] is looking at ways to try to release some of the pressure from this delay by . . . opening up beds in

different facilities or trying to do different things for certain people who might be amenable to a different path of treatment." March 29 Tr. at 17:1-5 (Bell).

The United States argued that, based on § 4241(d)(1)'s "plain reading," "the four-month period of time begins once the person has arrived at the facility, and it's not a four-month period that starts the day there's an order for competency restoration." March 29 Tr. at 17:22-18:3 (Bell). The Court asked whom the United States would hold 'in contempt for violating the court order," given that the Marshals "don't have any place to take the people" and the BOP "doesn't have the person." March 29 Tr. at 18:5-12 (Court). The United States contended that § 4241 does not "give[] much guidance there" and that the real issue is "the unique circumstances of these sorts of situations." March 29 Tr. at 18:16-21 (Bell). The United States argued that competency restoration evaluations are "difficult to predict" and that "the reason for the four-month limitation" is "because you don't want an indefinite process of, you know, can we or can we not restore . . . [b]ut because of the unique nature of the process, it's just not amenable to some sort of must happen, must get to hospital by this specific date." March 29 Tr. at 19:3-14 (Bell). The United States concluded that "the response to the motion to dismiss the indictment really covers the government's position in terms of the law." March 29 Tr. at 19:24-20:2 (Bell).

The Court asked Delorme if he had any last points to make on the motion. See March 29 Tr. at 20:7-8 (Court). Delorme reiterated that he believes that the "statute is clear, and at this point the four-month period has passed," which means that the Court should "follow the next step in the statute, [and] dismiss the indictment." March 29 Tr. at 20:21-22 (Carey). Delorme argued that it would be inconsistent with Jackson to allow "someone with mental health concerns such that they are deemed incompetent [to] sit in custody indefinitely," which could be the case if delays in bed space availability becomes even more scarce. March 29 Tr. at 21:14-21 (Carey). The Court

concluded by stating that it is likely that there is not an available remedy here, and although there "may be a constitutional violation" at some point, it is unclear if "it's at this point or something like two years." March 29 Tr. at 23:12-25 (Court).

## LAW REGARDING MENTAL COMPETENCY AND EXAMINATIONS

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 171 (1975). The Supreme Court has "approved a test of incompetence which seeks to ascertain whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him.'" Drope v. Missouri, 420 U.S. at 172 (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)). "[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." Drope v. Missouri, 420 U.S. at 171 (citing Pate v. Robinson, 383 U.S. 375 (1966)). The defendant cannot waive the issue of a his or her competence to proceed. See Pate v. Robinson, 383 U.S. at 384. Mental competency is a fluid concept, and so a finding that a defendant is mentally competent does not necessarily bind the court throughout the prosecution's pendency. See Drope v. Missouri, 420 U.S. at 179-80. Due process does not require a greater burden of proof in a competency hearing than a finding by a preponderance of the evidence. See Medina v. California, 505 U.S. 437, 446-52 (1992).

More recently, the Supreme Court has said that the competency requirement "has a modest aim: It seeks to ensure that [a defendant] has the capacity to understand the proceedings and to assist counsel." Godinez v. Moran, 509 U.S. 389, 402 (1993). As the Court has noted previously,

the Tenth Circuit has explained that, once the issue of competency has been raised, the process for

determining a defendant's competency occurs in three phases:

> Determining whether an accused is competent to stand trial is a three step process.  See generally United States v. Deters, 143 F.3d 577, 579-80 (10th Cir. 1998)(reviewing the process).  First, if there is "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent," the Court may order a psychiatric or psychological examination of the defendant.  18 U.S.C. § 4241(a).  At the second stage, the Court uses the psychological report and conducts a hearing to determine whether the defendant is competent.  If the defendant is not found to be competent, the Court must order the defendant hospitalized for up to four months to determine whether the defendant will become competent in the foreseeable future.  The Court may order additional hospitalization if it finds there is a substantial probability that within the additional time, the defendant will become competent.  See 18 U.S.C. §§ 4241(a), 4241(d).  At the third stage, after the specified period of confinement has expired, the Court determines whether the defendant is competent and thus ready to stand trial.  If still found not to be competent, the defendant must be released unless the Court finds that he presents a substantial risk of harm to others. See 18 U.S.C. §§ 4241(a),4241(d); United States v. Steil, 916 F.2d 485, 486-87 (8th Cir. 1990).

United States v. Rodriguez-Lopez, No. CR 08-2447, 2010 WL 4339282, at *4 (D.N.M. September

22, 2010)(Browning, J.)(quoting United States v. Boigegrain, 155 F.3d at 1184 n.1).  The Court

discusses the procedures associated with those three steps in turn.

### 1.     Procedure For Ordering a Competency Examination.

Under 18 U.S.C. § 4241(a), on the United States', a defendant's, or the Court's motion, the

Court may order a hearing to determine the defendant's competency to stand trial if there is

reasonable cause to believe that the defendant is incompetent.  See 18 U.S.C. § 4241(a).  Section

4241(a) provides that such a motion can be made at any time up to sentencing.  See 18 U.S.C.

§ 4241(a).  A competency examination is not required "in the absence of a sufficient factual basis

for the motion, or a lack of good faith in making the motion."  United States v. Alvarez-Ramirez,

No. CR 14-0131, 2014 WL 12787975, at *2 (D.N.M. September 7, 2014)(Brack, J.)(citing United

States v. Ramirez, 304 F.3d 1033, 1035 (10th Cir. 2002)).  A defense counsel's opinion that "the

defendant is not a person of sound mind and should have a further psychiatric examination before the case should be forced to trial" may be sufficient to raise the issue of competency. Drope v. Missouri, 420 U.S. at 177. A defense counsel who has a reason to believe that his or her client may not be competent to stand trial "is not only allowed to raise the competency issue, but, because of the importance of the prohibition on trying those who cannot understand proceedings against them . . . has a professional duty to do so when appropriate." United States v. Boigegrain, 155 F.3d at 1188 (citing Vogt v. United States, 88 F.3d 587, 592 (8th Cir. 1996)). A defendant who wishes to disregard the opinion of his or her counsel to avoid the competency issue cannot proceed pro se until competency proceedings have concluded, as "the degree of competence necessary to waive the right to counsel is identical to the degree of competence necessary to stand trial." United States v. Boigegrain, 155 F.3d at 1186 (citing Godinez v. Moran, 509 U.S. 389, 399-400 (1993)).

Section 4241(b) allows the Court to order a psychiatric or psychological examination pursuant to 18 U.S.C. § 4247(b) and (c) before the hearing. See 18 U.S.C. § 4241(b). A defendant may be committed to undergo an examination pursuant to an order under 18 U.S.C. § 4241 for "a reasonable period, but not to exceed thirty days." 18 U.S.C. § 4247(b). The examination must be conducted "in the suitable facility closest to the court," unless it is impracticable to do so. 18 U.S.C. § 4247(b). The Court is not limited to a single psychiatric or psychological examination, and may order a second competency examination when appropriate. See United States v. Martinez-Haro, 645 F.3d 1228, 1233 (10th Cir. 2011).

**2.      Procedure For Determining Competency.**

The Tenth Circuit states that "the test for competency is whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings

against him.'" United States v. Mackovich, 209 F.3d 1227, 1231-32 (10th Cir. 2000)(quoting

Drope v. Missouri, 420 U.S. at 171 (quoting Dusky v. United States, 362 U.S. at 402, and citing

Miles v. Dorsey, 61 F.3d 1459, 1472 (10th Cir. 1995))).  In determining competency, the Court

"['']may rely on a number of factors, including medical opinion and the court's observation of the

defendant.'" United States v. Boigegrain, 155 F.3d at 1189 (quoting United States v. Nichols, 56

F.3d 403, 411 (2d Cir. 1995)).  Section 4241(c) requires courts to conduct competency hearings

pursuant to 18 U.S.C. § 4247(d), which provides for: (i) representation of the defendant by

counsel; (ii) an opportunity for the defendant to testify, to present evidence, and to subpoena

witnesses on his or her behalf; and (iii) the opportunity for the defendant to confront and to cross-

examine witnesses.  See 18 U.S.C. §§ 4241(c), 4247(d).

A court "['']must first determine, by a preponderance of the evidence, whether the

Defendant suffers from "a mental disease or defect rendering him mentally incompetent to the

extent that he is unable to understand the nature and consequences of the proceedings against him

or to assist properly in his defense."'" United States v. Morales-Gonzales, 376 F. Supp. 2d 1066,

1070 (D.N.M. 2004)(Browning, J.)(quoting United States v. Azure, 279 F. Supp. 2d 1093, 1094

(D.N.D. 2003)(Hovland, J.)(quoting 18 U.S.C. § 4241(a), (d))).  The Court has acknowledged that

the Tenth Circuit states that the requisite level of competency "to stand trial is not great, and that

the court must analyze '"whether [the defendant] has sufficient present ability to consult with his

lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well

as factual understanding of the proceedings against him."'" United States v. Mooney, No. CR 08-

1545 JB, 2014 WL 711551, at *3 (D.N.M. February 7, 2014)(Browning, J.)(quoting McGregor v.

Gibson, 248 F.3d 946, 952 (10th Cir. 2001)(quoting Dusky v. United States, 362 U.S. at

402)(alteration in United States v. Mooney, and McGregor v. Gibson, but not Dusky v. United

States)).  If the Court concludes that a defendant is competent, then the case will proceed.  See

United States v. Morales-Gonzales, 376 F. Supp. 2d at 1070.  "'[I]f there is a finding of

incompetence to stand trial, there must be a period of hospitalization.'"  United States v. Morales-

Gonzales, 376 F. Supp. 2d at 1070 (alteration in original)(quoting United States v. Azure, 279 F.

Supp. 2d at 1095).

**3.     Procedure for Determining Potential to Regain Mental Competency.**

Following a hearing pursuant to 18 U.S.C. § 4241(c), the Court makes its determination

and disposition under § 4241(d) regarding whether the defendant is competent to stand trial.

18 U.S.C. § 4241(d).  Section 4241(d) provides:

> (d)      Determination and disposition. -- If, after the hearing, the court finds by a
> preponderance of the evidence that the defendant is presently suffering from
> a mental disease or defect rendering him mentally incompetent to the extent
> that he is unable to understand the nature and consequences of the
> proceedings against him or to assist properly in his defense, the court shall
> commit the defendant to the custody of the Attorney General.  The Attorney
> General shall hospitalize the defendant for treatment in a suitable facility --
>
> (1)      for such a reasonable period of time, not to exceed four
> months, as is necessary to determine whether there is a
> substantial probability that in the foreseeable future he will
> attain the capacity to permit the proceedings to go forward;
> and
>
> (2)      for an additional reasonable period of time until --
>
> (A)      his mental condition is so improved that trial
> may proceed, if the court finds that there is a
> substantial probability that within such
> additional period of time he will attain the
> capacity to permit the proceedings to go
> forward; or
>
> (B)      the pending charges against him are disposed
> of according to law; whichever is earlier.

If, at the end of the time period specified, it is determined that the defendant's mental condition has not so improved as to permit proceedings to go forward, the defendant is subject to the provisions of sections 4246 and 4248.

18 U.S.C. § 4241(d).  Commitment to the Attorney General's custody is mandatory following a finding of incompetence.  See United States v. Magassouba, 544 F.3d 387, 404 (2d Cir. 2008); United States v. Strong, 489 F.3d 1055, 1060-63 (9th Cir. 2007); United States v. Ferro, 321 F.3d 756, 761 (8th Cir. 2003); United States v. Donofrio, 896 F.2d 1301, 1303 (11th Cir. 1990); United States v. Shawar, 865 F.2d 856, 859-61 (7th Cir. 1989).  Once in the Attorney General's custody, a defendant is hospitalized for a period of time to determine if there is a "substantial probability that in the foreseeable future" that the defendant will be able to regain competency to stand trial. 18 U.S.C. § 4241(d)(1).  A determination of a defendant's potential to regain competency considers the potential efficacy of treatment and involuntary medication.  See United States v. Valenzuela-Puentes, 479 F.3d 1220, 1227 (10th Cir. 2007).  If there is not a substantial probability a defendant will regain competence in the foreseeable future, then a defendant will be hospitalized for an additional period of time until either: (i) a defendant's "mental condition is so improved that the trial may proceed"; or (ii) "the pending charges against him are disposed of," whichever is earlier.  18 U.S.C. § 4241(d).

"[F]or the ordinary citizen, commitment to a mental hospital produces 'a massive curtailment of liberty,' and in consequence 'requires due process protection.'"  Vitek v. Jones, 445 U.S. 480, 491-92 (1980)(quoting Humphrey v. Cady, 405 U.S. 504, 509 (1972); Addington v. Texas, 441 U.S. 418, 425 (1979); O'Connor v. Donaldson, 422 U.S. 563, 580 (1975)).  In Jackson, the Supreme Court concludes, on due process grounds, that a defendant who was committed to a mental hospital for three-and-a-half years could not be held "for an indefinite period simply on account of his incompetency to stand trial on the charges filed against him."  406 U.S. at 720.  In

that case, the Supreme Court stops short of "prescrib[ing] arbitrary time limits" for how long someone could be committed while awaiting trial, but states that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed," i.e., "to determine whether there is a substantial probability that he will attain . . . capacity in the foreseeable future." Jackson, 406 U.S. at 738.  If it is determined that a defendant cannot recover competency to the extent he or she can stand trial, then due process requires either "the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release [of] the defendant." Jackson, 406 U.S. at 738.  Section 4241(d)'s requirements reflect the protections that the Supreme Court articulates in Jackson. See United States v. Anderson, 679 F. App'x 711, 713 (10th Cir. 2017)(citing United States v. Strong, 489 F.3d 1055, 1061 (9th Cir. 2007); United States v. Donofrio, 896 F.2d 1301, 1302 (11th Cir. 1990); United States v. Shawar, 865 F.2d 856, 864 (7th Cir. 1989)).[7]

As § 4241(d) makes clear, hospitalization to determine if a defendant will regain competency in the foreseeable future may last only "for such a reasonable period of time, not the exceed four months, as is necessary to determine whether there is a substantial probability that in

___

[7]United States v. Anderson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored . . . . However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Anderson and Dartez v. Peters, 759 F. App'x 684 (10th Cir. 2018), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

- 28 -

the foreseeable future he will attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(1).  This hospitalization period begins once a defendant is "hospitalize[d] . . . for treatment in a suitable facility."  18 U.S.C. § 4241(d).  See United States v. Villegas, 589 F. App'x at 373 ("The plain language of § 4241(d) provides that the four-month period of evaluative commitment begins on the date of hospitalization."); United States v. Castrellon, No. 22-cr-00112, 2023 WL 2330688, at *3 (D. Colo. March 1, 2023)(Gallagher, J.)("[A] delay occurring between the time a court remands a defendant for restoration of competence and the time that the defendant actually begins hospitalization for treatment is not included with the four-month hospitalization period provided by § 4241(d)(1).")(citing United States v. Magassouba, 544 F.3d 387, 414 (2d Cir. 2008)); United States v. Berard, No. 22-cr-088-01, 2023 WL 3178793, at *6-7 (D.N.H. May 1, 2023)(McCafferty, J.); United States v. Lee, No: 21-CR-20034, 2022 WL 18275882, at *4 (S.D. Fla. December 27, 2022)(Damian, M.J.)).

## LAW REGARDING STATUTORY INTERPRETATION

When interpreting statutes, the Court must start with the plain language:

> We review issues of statutory construction de novo, "interpret[ing] the words of the statute in light of the purposes Congress sought to serve."  In so doing, we begin with the "language employed by Congress," and we "read the words of the statute in their context and with a view to their place in the overall statutory scheme."

Been v. O.K. Indus., Inc., 495 F.3d 1217, 1227 (10th Cir. 2007)(quoting Wright v. Fed. Bureau of Prisons, 451 F.3d 1231, 1233-34 (10th Cir. 2006)).  See United States v. Wright, 48 F.3d 254, 255 (7th Cir. 1995).  "It is well established that 'when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms.'"  Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004)(quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000)).  See In re Trans Ala. Pipeline Rate Cases, 436 U.S. 631, 643 (1978)(noting that a court may not disregard the statute's

plain language unless a literal application of the statutory language "would lead to absurd results . . . or would thwart the obvious purpose of the statute")(quoting Commissioner v. Brown, 380 U.S. 563, 571 (1965)).  "Courts indulge 'a strong presumption that Congress expresses its intent through the language it chooses.  Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress has drafted it.'"  United Kingdom Ministry of Defence v. Trimble Navigation Ltd., 422 F.3d 165, 171 (4th Cir. 2005)(quoting Sigmon Coal Co. v. Apfel, 226 F.3d 291, 305 (4th Cir. 2000)).  See Pub. Lands Council v. Babbitt, 167 F.3d 1287, 1314 (10th Cir. 1999)("[W]e assume that the words chosen by Congress are employed in their ordinary sense and accurately express Congress's legislative purpose.").  See also Hamdan v. Chertoff, 626 F. Supp. 2d 1119, 1126 (D.N.M. 2007)(Browning, J.).

The Supreme Court has "frequently cautioned that 'it is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law."  United States v. Wells, 519 U.S. 482, 496 (1997)(quoting Nat'l Lab. Rels. Bd. v. Plasterers' Local Union No. 79, 404 U.S. 116, 129-130 (1971)).  An omission of a substantive or procedural aspect in a statute does not invite "a judicial guess as to what Congress would have wanted."  Sec. Exch. Comm'n v. Traffic Monsoon, LLC, 245 F. Supp. 3d 1275, 1290 (D. Utah 2017)(Parrish, J.).  In the face of Congressional silence, the judiciary must be cautious to avoid "insert[ing] convenient language to yield the court's preferred meaning."  Borden v. United States, 141 S. Ct. 1817, 1829 (2021).

When Congress does not provide a cause of action, the Court is not authorized[8] "to create causes of action -- decreeing them to be 'implied' by the mere existence of a statutory or

---

[8]In Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), the Supreme Court creates a cause of action under the Fourth Amendment against federal agents who allegedly "manacled the plaintiff in front of his wife and children, and threatened to

constitutional prohibition." <u>Corr. Servs. Corp. v. Malesko</u>, 542 U.S. 61, 75 (2001)(Scalia, J.,

concurring).  "At bottom, creating a cause of action is a legislative endeavor.  Courts engaged in

that unenviable task must evaluate a 'range of policy considerations,'" which Congress is better

equipped to consider.  <u>Egbert v. Boule</u>, 142 S. Ct. 1793, 1802-03 (2022)(quoting <u>Bivens v. Six</u>

<u>Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388, 407 (1971)).  Generally,

"'even a single sound reason to defer to Congress' is enough to require a court to refrain" from

implying a cause of action where none has been provided.  <u>Egbert v. Boule</u>, 142 S. Ct. at 1803

(quoting <u>Nestlé USA, Inc. v. Doe</u>, 141 S. Ct. 1931, 1937 (2021)).

### LAW REGARDING CONTEMPT

Regarding the power to hold a party in contempt, 18 U.S.C. § 401 states:

A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as --

(1)    Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2)    Misbehavior of any of its officers in their official transactions;

(3)    Disobedience or resistance to its lawful writ, process, order rule, decree, or command.

18 U.S.C. § 401.  The contempt power "lies at the core" of the judicial system and "involves orders

uniquely related" to the Court's ability to carry out its judicial function.  <u>Balderama v. Bulman</u>,

---

arrest the entire family."  402 U.S. at 389.  While the Supreme Court recognizes that "the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages" a remedy was deemed appropriate under general principles of federal jurisdiction. <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. at 396.  Since that decision the Supreme Court has not "implied additional causes of action under the Constitution. Now long past 'the heady days in which this Court assumed common-law powers to create causes of action' we have come 'to appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power.'"  <u>Egbert v. Boule</u>, 142 S. Ct. at 1802 (quoting <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. at 75 (Scalia, J., concurring); <u>Hernandez v. Mesa</u>, 140 S. Ct. 735, 741 (2020)).

No. CIV 21-1037, 2023 WL 2728148, at *10 (D.N.M. March 31, 2023)(Browning. J.)(citing Juidice v. Vail, 430 U.S. 327, 335 (1976)).  Rule 70 of the Federal Rules of Civil Procedure empower the Court to hold a disobedient party in contempt when "a judgment requires a party to convey land, to deliver a deed or other document, or to perform any other specific act and the party fails to comply within the time specified."  Fed. R. Civ. P. 70.  Similarly, rule 42(a) of the Federal Rules of Criminal Procedure provides that "[a]ny person who commits criminal contempt may be punished for that contempt after prosecution on notice."  Fed. R. Crim. P. 42(a).

    "Contempts are neither wholly civil nor altogether criminal," and contempt orders are distinguished by their "character and purpose."  Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 441 (1911).  "If it is for civil contempt[,] the punishment is remedial, and for the benefit of the complainant.  But if it is for criminal contempt[,] the sentence is punitive, to vindicate the authority of the court."  Gompers v. Bucks Stove & Range Co., 211 U.S. at 441.  The Supreme Court recognizes that "[m]ost contempt sanctions, like most criminal punishments, to some extent punish a prior offense as well as coerce an offender's future obedience," and, accordingly, holds that "conclusions about the civil or criminal nature of a contempt sanction are properly drawn, not from 'the subjective intent of a State's laws and its courts,' but 'from an examination of the character of the relief itself.'"  Int'l Union v. Bagwell, 512 U.S. 821, 828 (1994)(quoting Hicks v. Feiock, 485 U.S. 624, 635, 636 (1988)).

    1.    **Civil Contempt Orders.**

    "To prevail in a civil contempt proceeding, the plaintiff has the burden of proving, by clear and convincing evidence, . . . that a valid court order existed, that the defendant had knowledge of the order, and that the defendant disobeyed the order."  Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d 1311, 1315 (10th Cir. 1998)(citing Roe v. Operation Rescue, 54 F.3d 133, 137 (3d Cir. 1995)).

A civil contempt order "is characterized by the court's desire 'to compel obedience of the court order or to compensate the litigant for injuries sustained from the disobedience.'" Ager v. Jane C. Stormont Hosp. & Training Sch. For Nurses, 622 F.2d 496, 500 (10th Cir. 1980)(quoting Norman Bridge Drug Co. v. Banner, 529 F.2d 822, 827 (5th Cir. 1976)).  Because a civil contempt order's purpose is to "compel obedience, the party held in contempt 'carries the keys of his prison in his own pocket' and 'can end the sentence and discharge himself at any moment by doing what he had previously refused to do.'"   Dartez v. Peters, 759 F. App'x 684, 690 (10th Cir. 2018)(quoting Gompers v. Bucks Stove & Range Co., 211 U.S. at 442).  Similarly, "[a] contempt fine accordingly is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'"   Int'l Union v. Bagwell, 512 U.S. at 829 (quoting United States v. United Mine Workers of Am., 330 U.S. 258, 303-04 (1947)(alteration and ellipses in Int'l Union v. Bagwell, but not United States v. United Mine Workers of America)).  When the purpose of a civil contempt proceeding is compensation, the "fine must of course be based upon evidence of complainant's actual loss."  United States v. United Mine Workers of Am., 330 U.S. at 304.  When the Court is attempting to coerce compliance through civil contempt proceedings, "actual damages are not a prerequisite."  Pueblo of Pojoaque v. New Mexico, No. CIV 15-0625, 2016 WL 3135644, at *12 (D.N.M. April 21, 2016)(Browning, J.)(citing Hart's Rocky Mountain Retreat, Inc. v. Gayhart, No. 06-cv-01235, 2007 WL 2491856, at *2 (D. Colo. August 29, 2007)(Miller, J.)).

    **2.**    **Criminal Contempt Orders.**

"The primary purpose of a criminal contempt is to punish defiance of a court's judicial authority.  Accordingly, the normal beneficiaries of such an order are the courts and the public interest."  Ager v. Jane C. Stormont Hosp. & Training Sch. for Nurses, 622 F.2d at 499-500 (citing

Norman Bridge Drug Co. v. Banner, 529 F.2d at 822).  Unlike a civil contempt order, "a fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a 'completed act of disobedience,' . . . such that the contemnor cannot avoid or abbreviate the confinement through later compliance." Int'l Union v. Bagwell, 512 U.S. at 828-29 (quoting Gompers v. Bucks Stove & Range Co., 221 U.S. at 443).  A fine announced "after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." Int'l Union v. Bagwell, 512 U.S. at 829 (citing Penfield Co. of Cal. v. S.E.C., 330 U.S. 585, 588 (1947)).  Because "criminal contempt is a crime in the ordinary sense," Bloom v. Illinois, 391 U.S. 194, 201 (1968), "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings," Hicks v. Feiock, 485 U.S. at 632.  Defendants in a criminal contempt proceeding thus must "be presumed innocent, proved guilty beyond a reasonable doubt, and accorded the right to refuse to testify against themselves." Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 798 (1987)(citing Gompers v. Bucks Stove & Range Co., 221 U.S. at 444).  The Court may hold a person in criminal contempt either: (i) through disposition after notice; or (ii) through summary disposition.  See Fed. R. Crim. P. 42(a), (b).

Rule 42(a) of the Federal Rules of Criminal Procedure details the requirements of a criminal contempt order issued through disposition after notice:

> (3)   *Notice*.  The court must give the person notice in open court, in an order to show cause, or in an arrest order. The notice must:
>
>   (3)   state the time and place of the trial;
>
>   (B)   allow the defendant a reasonable time to prepare a defense; and
>
>   (C)   state the essential facts constituting the charged criminal contempt and describe it as such.

(2)    *Appointing a Prosecutor*.   The Court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney.   If the government declines the request, the court must appoint another attorney to prosecute the contempt.

(3)    *Trial and Disposition*.   A person being prosecuted for criminal contempt is entitled to a jury trial in any case in which federal law so provides and must be released or detained as Rule 46 provides.   If the criminal contempt involves disrespect toward or criticism of a judge, that judge is disqualified from presiding at the contempt trial or hearing unless the defendant consents.   Upon a finding or verdict of guilty, the court must impose the punishment.

Fed. R. Crim. P. 42(a) (italics in original).   While "[t]he degree of procedural safeguards required for criminal contempt proceedings varies based on the seriousness of the penalty, . . . notice is a basic requirement for any criminal contempt proceeding."   Law v. Nat'l Collegiate Athletics Ass'n, 134 F.3d 1025, 1030 (10th Cir. 1998).   The Court first must request to appoint a public prosecutor in contempt proceedings and "should appoint a private prosecutor only if that request is denied."   Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. at 801.   If the Court appoints a private prosecutor, it must be certain that the private prosecutor is "as disinterested as a public prosecutor who undertakes such a prosecution."   Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. at 804.   A defendant who is charged with criminal contempt has the same right to a jury as a defendant charged with any other criminal offense, because, "in terms of those considerations which make the right to jury trial fundamental in criminal cases, there is no substantial difference between serious contempts and other serious crimes."   Bloom v. Illinois, 391 U.S. at 202.   The right to a jury will vary with the severity of the penalty, because "many contempts are not serious crimes but petty offenses not within the jury trial provisions of the Constitution."   Bloom v. Illinois, 391 U.S. at 209.

Rule 42(b) allows the Court to issue order of criminal contempt by summary disposition

against "a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies." Fed. R. Crim. P. 42(b). "Summary disposition contempt proceedings under Rule 42(b) are 'reserved for exceptional circumstances' such as acts threatening the judge or disrupting a hearing or obstructing court proceedings.'" Dartez v. Peters, 759 F. App'x at 691 (quoting Harris v. United States, 382 U.S. 162, 164 (1965)(quoting Brown v. United States, 359 U.S. 41, 54 (1959)(Warren, C.J., dissenting))). "The requirement that the contempt occur in the 'presence' of the court focuses on the contemnor's physical presence before the court at the time of the action supporting the contempt and does not reach so broadly as to include an act performed outside the physical presence of the court even if the act has 'some direct relation to the work of the court.'" Dartez v. Peters, 759 F. App'x at 691 (quoting Nye v. United States, 313 U.S. 33, 49 (1941).

**ANALYSIS**

The Court denies the MTD. First, the Court analyzes 18 U.S.C. § 4241(d) and concludes that, because the statute's plain language indicates that its four-month hospitalization starts when a defendant arrives at a suitable facility, and not while the defendant is awaiting transport, no violation of the statute has occurred in Delorme's case. Second, the Court concludes that no violation of Delorme's due process rights under Jackson has occurred, because the time he has spent awaiting transport, while unfortunate, bears a reasonable relation to effectuating his hospitalization. Third, the Court concludes that, even if a violation of § 4241(d) or Delorme's due process rights had occurred, dismissing the case against Delorme or expediting his transport would be an inappropriate and unworkable use of the Court's supervisory power. For these reasons, the Court denies the MTD.

I.      **BECAUSE  18 U.S.C.  § 4241(d)'S  FOUR-MONTH  HOSPITALIZATION  TIME PERIOD  BEGINS  TO  RUN  AT  HOSPITALIZATION,  AND  NOT  WHILE  A DEFENDANT IS AWAITING TRANSPORT, THERE IS NO VIOLATION OF THE STATUTE.**

The Court concludes that no violation of § 4241(d) has occurred in this case, because the statute's four-month hospitalization period begins to run when the defendant is hospitalized, and not while the defendant is awaiting transport.  In arriving at this determination, the Court examines (i) Section 4241(d)'s plain language, which reveals conclusively that Congress chose to limit the time a defendant spends hospitalized, but not the defendant's time in the Attorney General's custody pre-hospitalization; and (ii) Section 4241(d)'s legislative history, which provides further support for the Court's plain-language analysis.  The Court then applies § 4241(d) to the facts of Delorme's case and concludes that no violation of the statute has occurred, because there is no evidence that Delorme spent more than four months hospitalized.

A.      **SECTION 4241(d) SETS A FOUR-MONTH LIMIT ON THE TIME A DEFENDANT SPENDS HOSPITALIZED, BUT DOES NOT SET A LIMIT ON THE AMOUNT OF TIME A DEFENDANT MAY SPEND AWAITING HOSPITALIZATION.**

The plain language of 18 U.S.C. § 4241(d) indicates that Congress chose to limit the amount of time a defendant may be hospitalized to four months, but chose not to place a limit on the amount of time a defendant spends waiting to be hospitalized.  The Court notes that its "sole function" in this instance, where "the disposition required by the text is not absurd," is to enforce § 4241(d) "according to its terms."  Lamie v. U.S. Tr., 540 U.S. at 534 (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. at 6).  Accordingly, the Court's analysis proceeds with a recitation of § 4241(d), which states, in relevant part:

> (d)     *Determination and Disposition*. If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall

commit the defendant to the custody of the Attorney General.  The Attorney
General shall hospitalize the defendant for treatment in a suitable facility --

(1)     for such a reasonable period of time, not to exceed four months, as
        is necessary to determine whether there is a substantial probability
        that in the foreseeable future, he will attain the capacity to permit
        the proceedings to go forward . . . .

18 U.S.C. § 4241(d) (italics in original).  The only time limit in § 4241(d) is expressed as follows:

"The Attorney General shall hospitalize the defendant for treatment in a suitable facility . . . for

such a reasonable period of time, not to exceed four months."  18 U.S.C. § 4241(d).  Accordingly,

the Court examines the plain meaning of the four-month limitation provision's words "in their

context and with a view to their place in the overall statutory scheme."  Been v. O.K. Indus., Inc.,

495 F.3d at 1227 (quoting Wright v. Fed. Bureau of Prisons, 451 F.3d at 1233-34).

        The Court concludes that § 4241(d)'s plain language indicates that the four-month limit on

Delorme's "treatment in a suitable facility" applies only to the time he is "hospitalize[d]," and not

the time before he arrives at a hospital.  18 U.S.C. § 4241(d).  Although the statute states that "[t]he

Attorney General shall hospitalize the defendant for treatment in a suitable facility . . . for such a

reasonable period of time, not to exceed four months," it is silent about the amount of time the

defendant may remain in the Attorney General's custody before being hospitalized.  18 U.S.C.

§ 4241(d).  The Court heeds the Supreme Court's warning that "'it is at best treacherous to find in

congressional silence alone the adoption of a controlling rule of law.'"  United States v. Wells,

519 U.S. at 496 (quoting Nat'l Lab. Rels. Bd. v. Plasterers' Local Union No. 79, 404 U.S. at 129-

130).  In its interpretation, the Court will not "insert convenient language to yield the court's

preferred meaning."  Borden v. United States, 141 S. Ct. at 1829.  Accordingly, the Court follows

§ 4241(d)'s text: there is a four-month limit on the amount of time a defendant can be hospitalized,

but no statutory limit on the amount of time he or she may have to wait for transport to a suitable

facility.  Because the statutory language is clear and unambiguous, the Court adheres to its "['']duty of enforcing the terms of the statute as Congress has drafted it.'"  United Kingdom Ministry of Defence v. Trimble Navigation, Ltd., 422 F.3d at 171 (quoting Sigmon Coal Co. v. Apfel, 226 F.3d at 305).  Accordingly, while defendant transport wait times must comport with due process, see Jackson, 406 U.S. at 738-39, § 4241(d) does not impose a specific limit on how long a defendant may have to wait to be hospitalized, see 18 U.S.C. § 4241(d).

Delorme's argument that the four-month time limit applies to the entire time that he is in the Attorney General's custody and not just to the time he is hospitalized is unpersuasive, because the argument requires the Court to read into the statute language which Congress chose to omit. See Supplement at 3-4.  Delorme's interpretation does not comply with the text's plain meaning. The four-month time limit appears in § 4241(d)(1) next to a description of the time period in which it will be determined if "there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward."  18 U.S.C. § 4241(d)(1).  Interpreting the four-month time limit to modify anything other than this period would run afoul of principles of statutory interpretation by "divorc[ing] a noun from the modifier next to it without some extraordinary reason."  Lopez v. Gonzales, 549 U.S. 47, 56 (2006).  The Court thus must read the statute to limit the period where a defendant's potential to regain competency is assessed at a medical facility, and this period does not include time in the Attorney General's custody.  Further, the Attorney General cannot "determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward" until Delorme is hospitalized.  18 U.S.C. § 4241(d)(1).  It would contradict the statute's text to interpret a period in which a serious medical evaluation is prescribed as one in which a defendant is in the custody of a government official who cannot perform that evaluation.  Further, to consider this

time period as encompassing both the time in the Attorney General's custody and the time a defendant is hospitalized would render the latter provision superfluous.  The Court should not "['] adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.'"  United States v. Jicarilla Apache Nation, 564 U.S. 162, 185 (2011)(quoting Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 837 (1988)).

Similarly, Delorme's contentions regarding legislative history are unpersuasive, because when the Court "finds the terms of a statute unambiguous, judicial inquiry is complete."  Rubin v. United States, 449 U.S. 424, 430 (1981).  Delorme asserts that § 4241(d)'s legislative history "demonstrate[s] that Congress 'assumed a defendant would be hospitalized in short order following his commitment to the custody of the Attorney General, such that four months would afford an adequate time for the entire evaluation process to be completed.'"  Supplement at 4 (quoting Donnelly, 41 F.4th at 1108 (Watford, J., concurring)).  In addressing this argument, the Court proceeds on the understanding that "the authoritative statement is the statutory text" and that "[e]xtrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."  Exxon Mobil Corp. v. Allapattah Servs., 545 U.S. 546, 568 (2005)(Scalia, J.).  Because § 4241(d) is unambiguous, Delorme's reliance on legislative history is misplaced.

Nevertheless, the Court examines § 4241(d)'s legislative history and concludes that it does not disturb the Court's analysis of the statute's plain meaning.  That is to say, the legislative history suggests that Congress drafted the statute it intended to draft, i.e., one that limits the amount of time a defendant may be hospitalized, but not the amount of time spent waiting to be hospitalized. See Pub. Lands Council v. Babbitt, 167 F.3d at 1314 ("[W]e assume that the words chosen by Congress are employed in their ordinary sense and accurately express Congress's legislative

purpose."). While Delorme is correct that the statute's legislative history only "describes a single

period of 'commitment under section 4241,'" the period it describes is one in which a defendant's

mental condition is evaluated. Supplement at 4 (quoting <u>Donnelly</u>, 41 F.4th at 1108 (Watford, J.,

concurring)). <u>See</u> S Rep. No. 98-225, at 236. For context, the Court recites the relevant section

of the Report of the United States Senate Committee on the Judiciary in its entirety:

> If the court makes a finding of incompetency, it must then commit the
> defendant to the custody of the Attorney General, who is required to hospitalize the
> defendant for treatment in a suitable facility. For example, the Attorney General
> might conclude that a wing of a prison set aside for the treatment of offenders with
> mental illness could be suitable for a defendant charged with a serious crime of
> violence. In accord with the Supreme Court's holding in <i>Jackson v. Indiana</i>,
> commitment under section 4241 may only be for a reasonable period of time
> necessary to determine if there exists a substantial probability that the person will
> attain the capacity to permit the trial to go forward in the foreseeable future. Under
> section 4241(d)(1) the period may not exceed four months, however. If a
> determination is made that there is a substantial probability that the person can
> attain the capacity within an additional reasonable period of time, the commitment
> can continue for such additional reasonable period of time until his mental
> condition improves to the extent that the trial can proceed or until all charges
> against him are dropped, whichever is earlier. If, at, or before the end of the four-
> month period or the extension, it is determined that the defendant's mental
> condition will not so improve or has not so improved as to permit the trial to
> proceed, the defendant is made subject to the provisions of section 4246 dealing
> with hospitalization of a person due for release but suffering from a mental disease
> or defect.

S Rep. No. 98-225, at 236 (footnotes omitted).[9] The legislative history indicates that a four-month

limit is a "reasonable period of time necessary to determine if there exists a substantial probability

that the person will attain the capacity to permit the trial to go forward." S. Rep. No. 98-225, at

236. The legislative history does not reflect any discussion of what constitutes a reasonable time

period for a defendant is to be in the Attorney General's custody before hospitalization. <u>See</u> S Rep.

---

[9]As noted below, that the Report of the United States Senate Committee on the Judiciary for 18 U.S.C. § 4241 reveals that Congress implemented the four-month limit in § 4241(d)(1) "in accord with <i>Jackson v. Indiana</i>," has implications for Delorme's due-process arguments. S. Rep. No. 98-225, at 236.

No. 98-225, at 236.  The legislative history is clear that "a reasonable period of time" to determine the possibility of a defendant regaining competency "may not exceed four months"; it does not reveal, however, what Congress considers a reasonable period of time within which the Attorney General must "hospitalize the defendant."  S. Rep. No. 98-225, at 236.  Accordingly, the Court concludes that the legislative history in this case comports with § 4241(d)'s plain meaning, i.e., that the four-month hospitalization time period refers to the time during which a defendant is hospitalized, and not the time a defendant spends awaiting transport.

**B.     GIVEN THAT 18 U.S.C. § 4241(d)'S FOUR-MONTH HOSPITALIZATION PERIOD DOES NOT APPLY TO A DEFENDANT'S TIME SPENT AWAITING TRANSPORT, NO STATUTORY VIOLATION HAS OCCURRED.**

Applying 18 U.S.C. § 4241(d)'s plain meaning to Delorme's case, the Court concludes that no violation of the statute has occurred, because Delorme has not been hospitalized in a suitable facility for longer than four months.  See 18 U.S.C. 4241(d).  To be hospitalized is to be "place[d] in a hospital as a patient."  Hospitalize, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/hospitalize (last visited August 10, 2023).   While the meaning of a statutory term "does not turn solely on dictionary definitions of its component words," Yates v. United States, 574 U.S. 528, 537 (2015), there is no evidence that the meaning differs based on "the context in which it is used," Deal v. United States, 508 U.S. 129, 132 (1993).  The statute's context confirms hospitalization means arrival at a hospital or medical facility.  See 18 U.S.C. § 4241.  Section 4241(e) states that a defendant may be discharged from a facility when "the director of the facility in which a defendant is hospitalized" determines that the defendant has "recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense."  18 U.S.C. § 4241(e).  The text establishes that where the defendant is "hospitalized" is a "facility" that has a "director" who is able to determine

the defendant's mental competency.  18 U.S.C. § 4241(e).  A facility with a director who is able to make a determination about the defendant's mental capacity is necessarily a hospital or medical center.  The statute defines hospitalization as the period in which Delorme is in a hospital or medical center's care.  See 18 U.S.C. § 4241(d).  At the time he filed his Supplement, Delorme had not arrived at any hospital or equivalent medical facility.  See Supplement at 2.  The time that he has spent waiting to be hospitalized is not time spent hospitalized and, accordingly, does not count toward the four-month hospitalization period which Congress specifies in § 4241(d).

While Delorme's wait is unfortunate, the Court exercises a judicial power, not a legislative one, and the existence of an important issue does not justify a departure from the Court's "sole function" when a statute's "language is plain" and the "disposition required by the text is not absurd": the enforcement of the statute "according to its terms."  Lamie v. U.S. Tr., 540 U.S. at 534 (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. at 6).  It being "['at best treacherous to find in congressional silence alone the adoption of a controlling rule of law,'" the Court declines to apply § 4241(d)'s four-month limit to the time Delorme has spent awaiting transport when the statute's plain language does not support that understanding.  United States v. Wells, 519 U.S. at 496 (quoting NLRB v. Plasterers', 404 U.S. at 129-130).  Indeed, an omission of a substantive or procedural aspect in a statute does not invite "a judicial guess as to what Congress would have wanted."  Sec. Exch. Comm'n v. Traffic Monsoon, LLC, 245 F. Supp. 3d at 1290.  Accordingly, the Court concludes that no violation of § 4241(d) has occurred.[10]

---

[10]Having concluded that no violation of § 4241(d) has occurred, the Court notes that the United States' argument that Delorme's MTD is inappropriate, because it skips over Sell's first factor (evaluating the governmental interest in involuntary medication), misconstrues this doctrine's purpose.  See Response at 8 (citing Sell, 539 U.S. at 180-81).  An analysis under Sell focuses exclusively on allowing "involuntary administration of drugs solely for trial competence

## II.     DELORME'S TRANSPORT DELAY DOES NOT RUN AFOUL OF DUE PROCESS UNDER JACKSON.

Absent a statutory limitation on how much time a defendant can spend under § 4241(d) awaiting hospitalization, the Court analyzes whether the delays Delorme has experienced nonetheless violate his due process rights under Jackson, and concludes that no due process violation has occurred.   Delorme invokes Jackson, a case which establishes constitutional parameters for pretrial commitment of defendants incompetent to stand trial, and Donnelly, a Ninth Circuit case applying Jackson in the § 4241(d) context, as support for his argument that the time he has spent awaiting hospitalization is unreasonable and warrants the Indictment's dismissal.  See MTD at 3-4; Supplement at 1-5.  The Court approaches its analysis in light of the due process parameters that Jackson imposes.  See 406 U.S. at 738.  The Court, however, disagrees with Donnelly, which determines through conclusory reasoning that, because § 4241(d) sets a four-month limit for hospitalization, it is unreasonable under Jackson and a violation of the statute for a defendant in the Attorney General's custody to have to wait more than four months for hospitalization.  See 41 F.4th at 1106.  Further, the Court expresses its respectful disagreement with Donnelly's progeny in this District, United States v. Lara, a case which adopts in part Donnelly's reasoning to conclude that an eight-month transport delay under § 4241(d) constitutes a due process violation, see United States v. Lara, No. CR 21-1930, 2023 WL 3168646, at *5, (D.N.M. April 28, 2023)(Garcia, J.), and which goes further than Donnelly by embracing dismissal -- a remedy Donnelly contemplated but chose not to implement -- as a remedy for the violation,

---

purposes," and Delorme is not arguing that an involuntary administration of drugs is inappropriate. Sell, 539 U.S. at 180.  It has yet to be determined if Delorme will need medication to regain competency, if this medication will have to be administered involuntarily, or if regaining competency is possible at all.  See Supplement at 2.  It is, therefore, irrelevant whether Delorme addressed the first factor of Sell at this stage.

see United States v. Lara, No. CR 21-1930, 2023 WL 3316274, at *2 (D.N.M. May 5, 2023).  The

Court's analysis proceeds with a discussion of Jackson, before analyzing whether the delay

Delorme has experienced rises to a due process violation in light of Jackson, and finally examining

Donnelly and United States v. Lara.

A.  **JACKSON ESTABLISHES DUE PROCESS PARAMETERS FOR PRETRIAL COMMITMENT FOR DEFENDANTS INCOMPETENT TO STAND TRIAL WHICH INFORM 18 U.S.C. § 4241 AND GUIDE THE COURT'S DUE PROCESS ANALYSIS.**

Jackson created parameters for pretrial commitment of defendants incompetent to stand

trial when it held that a defendant with intellectual disabilities,[11] who was committed, pre-trial, to

a mental hospital for three-and-a-half years, could not be held "for an indefinite period simply on

account of his incompetency to stand trial on the charges filed against him."  406 U.S. at 720.

Under Indiana State law, and on a finding that the defendant "'lack(ed) comprehension sufficient

to make his defense'" at trial, the trial court ordered the defendant "committed to the Indiana

Department of Mental Health until such time as that Department should certify to the court that

'the defendant is sane,'" a potentially open-ended commitment period, given the defendant's

condition.  406 U.S. at 719.  Indeed, the Supreme Court noted that "[t]here is nothing in the record

that even points to any possibility that Jackson's present condition can be remedied at any future

---

[11]The Supreme Court describes the defendant in Jackson as "a mentally defective deaf mute with a mental level of a pre-school child" who "cannot read, write, or otherwise communicate except through limited sign language."  Jackson, 406 U.S. at 717.  The defendant's competency evaluation "concluded that Jackson's almost non-existent communication skill, together with his lack of hearing and his mental deficiency, left him unable to understand the nature of the charges against him or to participate in his defense," with one doctor testifying that "it was extremely unlikely that petitioner could ever learn to read or write and question[ing] whether petitioner even had the ability to develop any proficiency in sign language," and another testifying that, "even if Jackson were not a deaf mute, he would be incompetent to stand trial," and that there was "doubt[] whether petitioner had sufficient intelligence ever to develop the necessary communication skills." 406 U.S. at 718-19.

time." 406 U.S. at 726.  Reviewing the defendant's pre-trial commitment on due process grounds, the Supreme Court held that

> a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.

406 U.S. 738.  The Supreme Court stops short of "prescrib[ing] arbitrary time limits" for how long someone could be committed while awaiting trial, but states that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed," i.e., to evaluate whether the defendant will gain the capacity necessary to participate at trial.  Jackson, 406 U.S. at 738.  If it is determined that a defendant cannot gain competency, then due process requires either "the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release [of] the defendant."  Jackson, 406 U.S. at 738.

Without setting hard limits, Jackson establishes constitutional parameters for pretrial commitment of defendants incompetent to stand trial, just as Barker v. Wingo, 407 U.S. 514 (1972), "set out the criteria by which the speedy trial right is to be judged."  Barker v. Wingo, 407 U.S. at 516.  Within those parameters, Congress is free to set more restrictive, hard limits, and, in both the pretrial commitment and speedy trial contexts, Congress has set stricter limits that do not test the constitutional requirements.  In Barker v. Wingo, the Supreme Court concludes that a five-year delay between arrest and trial, of which "[o]nly seven months [could] be attributed to a strong excuse," is permissible.  407 U.S. at 533-34.  The Speedy Trial Act, in sharp contrast, "requires that a federal criminal trial commence within seventy days of the later of the filing of the information or indictment or the defendant's initial appearance."  United States v. Larson, 627 F.3d 1198, 1203 (10th Cir. 2010)(citing 18 U.S.C. § 3161(c)(1)).  The Speedy Trial Act's seventy-

day limit is considerably stricter than <u>Barker v. Wingo</u>'s time period.  Section 4241's enactment

is analogous to the Speedy Trial Act's passage, because it also goes further than existing case law

to impose a firm limit on how long a pretrial procedure -- in this case, hospitalization to determine

mental competency -- can take.  In § 4241(d)(1), Congress decided that a duration of time "not to

exceed four months" is reasonably related to "determin[ing] whether there is substantial

probability" that a defendant will attain capacity.  18 U.S.C. § 4241(d)(1).  Indeed, the Report of

the United States Senate Committee on the Judiciary for 18 U.S.C. § 4241 indicates that, when

Congress chose to impose a limit on a defendant's hospitalization without reference to the pre-

hospitalization period, it did so with <u>Jackson</u> in mind.  <u>See</u> S. Rep. No. 98-225, at 236.  Specifically,

it states: "In accord with the Supreme Court's holding in *Jackson v. Indiana*, commitment under

section 4241 may only be for a reasonable period of time necessary to determine if there exists a

substantial probability that the person will attain . . . capacity . . . .   Under section 4241(d)(1) the

period may not exceed four months."  S. Rep. No. 98-225, at 236.

The Supreme Court in <u>Jackson</u> provides Congress with rough due process parameters,

rather than sharp time limits.  <u>See</u> 406 U.S. at 738.  While the Supreme Court in <u>Jackson</u> declined

to "prescribe arbitrary time limits" for how long someone could be committed while awaiting trial,

it determined that the severely intellectually disabled defendant in that case having been committed

for three-and-a-half years "sufficiently establishes the lack of a substantial probability that he will

ever be able to participate fully in a trial."  406 U.S. at 738-39.  It is not clear from <u>Jackson</u> whether

the Supreme Court would have come to the same conclusion, <u>i.e.</u>, that three-and-a-half years of

pretrial commitment is unreasonable, if the defendant's psychological examination suggested that

he would be more likely to regain competence to participate in a trial than the defendant in <u>Jackson</u>,

who presented an extreme case of intellectual disability that suggested he would never attain

competency.  See 406 U.S. at 717-19 (discussing extent of the defendant's disabilities); id. at 726 ("There is nothing in the record that even points to any possibility that Jackson's present condition can be remedied at any future time.").  Indeed, the Supreme Court notes in Jackson that, "[w]ere the State's factual premise that Jackson's commitment is only temporary a valid one, this might well be a different case."  406 U.S. at 725.  In any event, Jackson sets constitutional parameters rooted in a reasonableness inquiry, rather than hard timeframes, which creates a deferential due process standard for entities charged with committing defendants pre-trial.  Accordingly, the Supreme Court's conclusion in Jackson provides Congress with some guidance as to what the outer bounds of due process reasonableness might be, dependent on the profile of the defendant, and Congress chose to set a considerably stricter statutory limit on hospitalization, i.e., four months.  See S. Rep. No. 98-225, at 236.

In summary, the statutory time limitations under § 4241(d)(1) are stricter than the Supreme Court's due process boundaries that Jackson establishes, which turn on a reasonableness analysis.  See Jackson, 406 U.S. at 738.  Perhaps because the Jackson due process boundaries are more expansive than the statutory boundaries of § 4241(d), the Tenth Circuit has not confronted a case interpreting what is a reasonable length of time from a due process perspective under Jackson.[12] Under Jackson, therefore, courts are left to determine, on a case-by-case basis, whether the "nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."  406 U.S. at 738.  The Court's analysis proceeds by examining the facts surrounding

---

[12]Every United States Courts of Appeals that has considered 18 U.S.C. § 4241's constitutionality has concluded that the statute itself, which imposes the four-month hospitalization period, does not violate due process.  See United States v. McKown, 930 F.3d 721, 728 & n.7 (5th Cir. 2019)(expressing agreement "with every court of appeals to have addressed the constitutionality of § 4241(d) in holding that the statute complies with due process," and collecting cases).

the pretrial delays Delorme has experienced.

      **B.**    **THE DELAYS THAT DELORME HAS FACED DO NOT RISE TO THE LEVEL OF A DUE PROCESS VIOLATION UNDER <u>JACKSON</u>, BECAUSE HIS TIME AWAITING HOSPITALIZATION IS REASONABLY RELATED TO EFFECTUATING HOSPITALIZATION.**

The Court concludes that the delays which Delorme has faced do not rise to a due process violation under <u>Jackson</u>, because the time that he has spent in the Attorney General's custody, while unfortunately long, still "bears some reasonable relation" to achieving his hospitalization under § 4241(d).  <u>Jackson</u>, 406 U.S. at 738.  Delorme's delay must be viewed in context.  The global pandemic and its aftermath have created major operational challenges for the BOP, which, as <u>Donnelly</u> noted in 2022, is "experiencing a significant backlog in placing defendants in suitable facilities for treatment, as § 4241(d) requires."  41 F.4th at 1104.  The Court discusses the nature of the delays in hospitalization plaguing defendants and the BOP before analyzing the facts of Delorme's case.

     The Court recognizes that Delorme's extended delay in transport to a suitable medical facility is a serious problem, the consequences of which it does not overlook.  Excessive delay in treatment for defendants deemed incompetent can exacerbate their condition, reduce the potential for a successful recovery, and delay their criminal cases' resolution.  <u>See</u> Eric Balaban, Freeing the Most Vulnerable: Litigation Tools to Reduce the Disabled Prisoner Population, 1 UCLA Crim. J.L.R. 1, 4 (2017).  Delay in transport to suitable behavioral health facilities for defendants declared mentally incompetent is not a new issue.  <u>See</u> Paul Tullis, <u>When Mental Illness Becomes a Jail Sentence</u>, The Atlantic (December 9, 2019), https://www.theatlantic.com/politics/archive/2019/12/when-mental-illness-becomes-jail-sentence/603154/ (last visited July 29, 2023)(detailing the delays experienced by mentally incompetent prisoners awaiting transport to mental-health facilities).  A lack of available space or qualified staff is often the cause of such delays, including

in State facilities.  See Abby Sewell, Defendants Declared Mentally Incompetent Face Lengthy Delays in Jails, Los Angeles Times (April 1, 2015), https://www.latimes.com/local/countygovernment/la-me-inmate-backlog-20150401-story.html (last visited July 29, 2023); Scott Shafer, State Sued as Mentally Ill Defendants Face Long Waits in Jail, KQED (August 12, 2015), https://www.kqed.org/news/10639560/state-sued-as-mentally-ill-defendants-face-long-waits-in-jail (last visited July 29, 2023).  The outbreak of the COVID-19 pandemic has exacerbated existing transport delays.  See Allison Sherry, Jailed Coloradans Waiting Longer and Longer for Competency Services, With Sometimes Tragic Consequences, CPR News (October 15, 2021), https://www.cpr.org/2021/10/15/jailed-coloradans-mental-illness-waiting-longer-competency-services-restoration-sometimes-tragic-consequences/ (last visited July 29, 2023)(identifying "COVID-19 outbreaks and staffing shortages" as the reason for increased wait times for transport to competency restoration programs).

The pandemic resulted in a widespread slowdown of BOP activity, with internal movement of inmates decreasing early in the pandemic by ninety percent as compared to pre-pandemic levels. See Press Release, Federal Bureau of Prisons, Bureau of Prisons Announces Update on Inmate Movement (May 22, 2020).  This decrease accompanied an early-pandemic policy designed to "significantly decrease incoming movement" of new inmates into all BOP facilities in an effort to "further mitigate the exposure and spread of COVID-19."  Press Release, Federal Bureau of Prisons, Bureau of Prisons COVID-19 Action Plan: Phase Five (March 31, 2020).  Currently, the BOP authorizes only four facilities to perform Competency Restorations pursuant to § 4241(d). See Study Order Process and BOP Bed Availability Information at 1, filed October 13, 2022 (Doc. 47-1)("Study Order").  As of late 2022, estimated wait times to for admittance into one of these facilities could range anywhere from four to nine months.  See Study Order at 2.  The BOP states

that the "significant wait times for beds into BOP medical facilities [are] due to limited staffing, resources, and bed availability." Study Order at 2. Indeed, the delays at issue here are not unique to Delorme's case and are acute in the global pandemic's wake. See, e.g., United States v. Lara, 2023 WL 3168646; United States v. Castrellon, No. 22-cr-00112, 2023 WL 2330688 (D. Colo. March 1, 2023)(Gallagher, J.); United States v. Black, No. CR 21-009, 2022 WL 17170707 (N.D. Okla. November 22, 2022)(Frizzell, J.); United States v. Leusogi, No. CR 21-32-TS, 2022 WL 11154688 (D. Utah 2022)(Stewart, J.).

The purpose of a defendant's commitment under § 4241(d) is actual hospitalization, as the statute's plain language states. See 18 U.S.C. § 4241(d). Delorme was committed with the goal of hospitalization in a suitable medical facility, and the Court emphasizes that there must be "progress toward that goal" in order to avoid a due process violation under Jackson. See 406 U.S. at 738. The delays which Delorme has experienced must "bear some reasonable relation," Jackson, 406 U.S. at 738, to the achievement of Section 4241(d)'s purpose, i.e., ensuring that he is hospitalized "to determine whether there is a substantial probability that . . . he will attain . . . capacity," 18 U.S.C. § 4241(d)(1). The Court's analysis proceeds on this understanding.

Delorme's extended time in the Attorney General's custody, although regrettable, does not rise to a due process violation under Jackson.[13] By the time Delorme filed the Supplement, he had

_____

[13]Further, the delay does not amount to "'outrageous government conduct'" under United States v. Harris, a case which Delorme cites in support of his argument that dismissal is warranted. MTD at 4 (citing United States v. Harris, 997 F.2d at 815). United States v. Harris characterizes "outrageous government conduct" as acts that "violate 'that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.'" United States v. Harris, 997 F.2d at 815 (quoting United States v. Russell, 411 U.S. 423, 431-32 (1973)(quoting Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246 (1960))). The delay in transporting Delorme does not rise to that level. BOP's attempts to cope with post-pandemic challenges, even if transport delays persist, do not constitute "'the most intolerable government conduct,'" a showing the Tenth Circuit requires. United States v. Harris, 997 F.2d at 815-16

been awaiting transport for "over nine months" since the Court committed him to the Attorney

General's custody for treatment.  Supplement at 2.  The Court recognizes that Delorme's wait has

been long and exceeds the typical wait for hospitalization under § 4241(d)(1) before the pandemic.

See November 7 Tr. at 11:2-13 (Court).  The Attorney General, however, is not holding Delorme

indefinitely; the effects of a pandemic that interrupted systems which have been operating

effectively for decades have, at least in part, delayed Delorme's transport.  See March 29 Tr. at

15:12-14(Court); March 29 Tr. at 16:4-9 (Bell).  Indeed, the Court understands that the primary

issue causing the transport delays across the country is that the facilities are at capacity.  See March

29 Tr. at 3:7-18 (Court); Study Order at 2.  Given BOP's backlog from the pandemic and staffing

shortages, the time Delorme has experienced waiting to be transported, although lengthy, still

"bear[s] some reasonable relation" to effectuating his hospitalization under § 4241(d).  Unlike

Jackson, where the defendant was confined for three-and-a-half years and the

"record . . . establish[d] the lack of a substantial probability that he will ever be able to participate

fully in a trial," there is no indication that Delorme's present transport delay suggests that he will

be waiting indefinitely.  406 U.S. at 738-39.  Arranging for hospitalization becomes more

complicated and takes longer when "[t]here are significant wait times for beds into the BOP

medical facilities due to limited staffing, resources, and bed availability."  Study Order at 2.  While

the long wait time Delorme has endured is unfortunate, the Court is not convinced, in light of the

circumstances facing the BOP, that it rises to the level of a due process violation under Jackson.

---

(quoting United States v. Warren, 747 F.2d 1339, 1341 (10th Cir. 1984)(quoting United States v. Jannotti, 673 F.2d 578, 608 (3d Cir. 1982))).

C.      **DONNELLY** AND ITS PROGENY MISAPPLY <u>JACKSON</u> TO CONCLUDE
THAT A FOUR-MONTH TRANSPORT DELAY UNDER 18 U.S.C.
§ 4241(d) IS UNREASONABLE.

The Court disagrees with <u>Donnelly</u> and its progeny, because those cases misapply <u>Jackson</u>.

First, the Court examines <u>Donnelly</u>, in which the Ninth Circuit concludes that a four-month

transport delay under § 4241(d) is unreasonable under <u>Jackson</u> and, accordingly, a statutory --

rather than due process -- violation.   Next, the Court examines <u>United States v. Lara</u>, in which

<u>Donnelly</u>'s reasoning is applied in the due process context.   Finally, the Court expresses its

respectful disagreement with the approach of <u>Donnelly</u> and <u>United States v. Lara</u>.

The defendant in the pandemic-era <u>Donnelly</u> case, much like Delorme, faced a monthslong

delay for hospitalization under § 4241(d) at a time when the BOP "is currently experiencing a

significant backlog in placing defendants in suitable facilities for treatment, as § 4241(d) requires."

<u>Donnelly</u>, 41 F.4th at 1104.   In November, 2021, the trial court in <u>Donnelly</u>, following a

psychological evaluation, ordered the defendant committed the Attorney General's custody for

further treatment under § 4241(d).   <u>See</u> 41 F.4th at 1103.   The defendant waited for hospitalization

for four months and, in March, 2022, received notice that his wait time likely would extend another

four months, which spurred him to move to dismiss the indictment for violations of § 4241(d) and

his due process rights.   <u>See</u> 41 F.4th at 1104.   In short, the defendant in <u>Donnelly</u> faced a similar

delay and made similar arguments to those which Delorme makes now.   <u>See</u> 41 F.4th at 1103-04.

The Honorable Michael H. Simon, United States District Judge for the United States District Court

for the District of Oregon, rejected the defendant's arguments and denied the motion to dismiss,

concluding, regarding the due process arguments, that the delay did not rise to the level of "'grossly

shocking and outrageous' conduct or 'flagrant misbehavior'" required for the district court to be

able to dismiss the indictment under Ninth Circuit law.   <u>United States v. Donnelly</u>, No. 3:21-CR-

232-SI, 2022 WL 1488430, at *1-5 (D. Or. May 11, 2022)(quoting United States v. Kearns, 5 F.3d 1251, 1253 (9th Cir. 1993)), vacated and remanded, 41 F.4th 1102.

In a per curiam opinion, the Ninth Circuit vacated Judge Simon's order and remanded the case, concluding that a violation of § 4241(d) occurred.[14]  See Donnelly, 41 F.4th at 1107-08. Reviewing § 4241(d), the Ninth Circuit concludes that the statute's four-month time hospitalization time period begins to run when the defendant is hospitalized, see 41 F.4th at 1105, but emphasizes, citing Jackson, that "the duration of the pre-hospitalization commitment period must be limited to the time reasonably required to accomplish" the Attorney General's tasks in arranging the defendant's transport, i.e., "identify[ing] a suitable facility and arrang[ing] for the defendant's transportation to that facility," 41 F.4th at 1106.  The following is the Ninth Circuit's reasoning in determining that a four-month wait violates the statute:

At the time the district court ruled on Donnelly's motion, he had already been held

---

[14]The Court finds it odd that, having concluded that "the text of the statute makes clear that the four-month time limit applies only to the period of hospitalization, and thus begins to run when the defendant has been hospitalized," 41 F.4th at 1105, the Ninth Circuit nonetheless determines that a pre-hospitalization delay caused a violation of § 4241(d), see 41 F.4th at 1106.  The apparent effect is to inject into § 4241(d), via Jackson's "reasonable relation" standard, a requirement that the pre-hospitalization period be shorter than four months, even though the statute is silent on that point.  See 41 F.4th at 1106.   Having proceeded this way, the Ninth Circuit notes in a footnote that it "need not resolve" whether a violation of the defendant's due process rights occurred, but notes that, even if it had determined that a due process violation occurred, dismissal would not be warranted, because "Donnelly has not shown the kind of 'grossly shocking and outrageous' government misconduct necessary to justify dismissal of the charges against him."  41 F.4th at 1107 n.3.  The Court discusses Donnelly in its due process analysis because, even though the Ninth Circuit characterizes the delay as a statutory rather than due process violation, courts have subsequently cited Donnelly in conjunction with Jackson to support a conclusion that a pre-hospitalization delay constitutes a due process violation.  See, e.g., United States v. Lara, 2023 WL 3168648, at *5 (citing Donnelly and its progeny, and concluding that "a detention period of eight months is unreasonable and runs afoul of the Constitution's guarantee of due process"); United States v. Wazny, No. 3:21-CR-247, 2022 WL 17363048, at *5 (Mariani, J.)("Consistent with the Ninth Circuit's reasoning [in Donnelly], this Court find that, while the time limit within which a defendant must be admitted to a suitable facility is not fixed, eight months facially offends basic due process principles and is presumptively unreasonable.").

in the custody of the Attorney General for nearly six months.  We do not think *Jackson*'s "reasonable relation requirement permits a pre-hospitalization commitment period, whose purpose is simply to identify an appropriate treatment facility and arrange for the defendant's transportation to that facility, to last longer than the maximum time Congress permitted for the period of hospitalization itself.  Thus, we have little difficulty concluding that whatever the outer limits of § 4241(d), the length of Donnelly's confinement exceeds it.  That fact is even more evident today, as Donnelly has now been held in the pre-hospitalization custody of the Attorney General for more than eight months -- twice as long as the maximum period Congress authorized for the entire length of a defendant's hospitalization."

41 F.4th at 1106.  Accordingly, the Ninth Circuit draws the line at four months, because, according

to that court, to exceed four months would be to exceed the amount of time Congress permits for

hospitalization itself.  See 41 F.4th at 1106.  The Honorable Paul J. Watford, United States Circuit

Judge for the United States Court of Appeals for the Ninth Circuit, concurring in the Ninth

Circuit's judgment, goes further, contending that Congress "imposed four months as the outside

limit on the entire period a defendant is committed to the custody of the Attorney General for

treatment and evaluation, inclusive of any pre-hospitalization delay."[15]  41 F.4th at 1108 (Watford,

J., concurring).  As to a remedy, the Ninth Circuit ordered the Attorney General to hospitalize the

defendant in a suitable facility within seven days.  See 41 F.4th at 1107.

In another pandemic-era case, United States v. Lara, the Honorable Matthew L. Garcia,

United States District Judge for the United States District Court for the District of New Mexico,

adopts in part the reasoning that the Ninth Circuit used to find a statutory violation of § 4241(d)

and applies it to conclude that an eight-month pre-hospitalization delay constitutes a due process

violation under Jackson.  See United States v. Lara, 2023 WL 3168646, at *5.  In that case,

---

[15]Judge Watford attributes the pre-hospitalization delays to "the lack of available bed space at the handful of facilities the Bureau of Prisons (BOP) has equipped to conduct competency evaluations under § 4241(d)," which he characterizes as "[t]he BOP's bureaucratic failure to allocate adequate agency resources to meet the demand for competency evaluations."  Donnelly, 41 F.4th at 1108-09 (Watford, J., concurring).

following a psychological examination, it was ordered in August, 2022, that the defendant be hospitalized under § 4241(d).  See 2023 WL 3168646, at *2.  In January, 2023, the defendant moved the Court to dismiss the indictment against him.  See 2023 WL 3168646, at *1.  In total, roughly eight months elapsed between the hospitalization order and Judge Garcia's memorandum opinion and order on the defendant's motion to dismiss the indictment, see 2023 WL 3168646, at *2, which makes the timeframe in United States v. Lara similar to that in Donnelly and in Delorme's case.

Judge Garcia cites Donnelly favorably and arrives at similar conclusions.  Like Donnelly, United States v. Lara concludes that § 4241(d)'s four-month time hospitalization period begins to run when the defendant is hospitalized.  See United States v. Lara, 2023 WL 3168646, at *3.  Judge Garcia adopts in part the Ninth Circuit's reasoning in Donnelly and concludes that "the period of pre-hospitalization detention . . . should not ordinarily extend beyond 'the maximum time Congress permitted for the period of hospitalization itself.'"  United States v. Lara, 2023 WL 3168646, at *5 (quoting Donnelly, 41 F.4th at 1106).  See id. at *4-5 (discussing Donnelly and cases that cite it, including United States v. Wazny, 2022 WL 17363048, and United States v. Leusogi, 22:21-CR-32-TS, 2022 WL 11154688 (D. Utah October 19, 2022)(Stewart, J.)). Departing from Donnelly, however, Judge Garcia finds a violation of due process, rather than § 4241 itself, noting that, "while the government must be afforded some latitude in carrying out the logistics to effectuate [§ 4241's] objectives, the Court has little difficulty in concluding that a detention period of eight months is unreasonable and runs afoul of the Constitution's guarantee of due process."  United States v. Lara, 2023 WL 3168646, at *5.  See United States v. Lara, 2023 WL 3316274, at *1 (characterizing the eight-month delay as a "constitutional violation").  As the Court discusses in greater detail in its remedies analysis, Judge Garcia first adopted the remedy

Donnelly prescribed, i.e., ordering the defendant's hospitalization be expedited within seven days, see United States v. Lara, 2023 WL 3168646, at *7, but, when the BOP did not heed the order, he ordered the remedy Donnelly considered and rejected, but left open as an option: dismissal of the indictment, see United States v. Lara, 2023 WL 3316274, at *2.

The Court disagrees with the Donnelly approach, which proceeds on the assumption that a four-month pre-hospitalization wait is per se unreasonable, on the basis of the Ninth Circuit's conclusory reasoning that Jackson's "reasonable relation" requirement cannot permit "a pre-hospitalization commitment period, whose purpose is simply to identify an appropriate treatment facility and arrange for the defendant's transportation to that facility, to last longer than the maximum time Congress permitted for the period of hospitalization itself." Donnelly, 41 F.4th at 1106.  The Court disagrees with the Donnelly approach's initial application, through which the Ninth Circuit found a violation of § 4241(d), see Donnelly, 41 F.4th at 1106, as well as subsequent applications, through which other courts found due process violations on similar facts, see United States v. Lara, 2023 WL 3168646, at *5.  Donnelly reflects a misunderstanding how § 4241(d) functions in practice, and does not provide the BOP sufficient latitude to respond to events that are in part beyond its control, specifically, the operational consequences of a global pandemic. Donnelly does not consider sufficiently the differences between Attorney General's logistical and administrative role in arranging for hospitalization, and the role of medical professionals in treating a defendant once the defendant is hospitalized.  Section 4241(d) commits a defendant deemed mentally incompetent to the Attorney General's custody to "hospitalize the defendant for treatment."  18 U.S.C. § 4241(d).  The statute's plain meaning requires that the Attorney General go beyond identifying a suitable facility and arranging for transport; it requires that the Attorney General ensure the defendant is admitted to a suitable facility, which in turn hinges on there being

capacity to accept the defendant at that facility.  See 18 U.S.C. § 4241(d).  The Attorney General fulfills his responsibility when the defendant has been admitted and not before the admission.  This largely logistical and administrative process is fundamentally different from hospitalization "to determine whether [a defendant] . . . will attain . . . capacity," which is a medical endeavor. 18 U.S.C. § 4241(d).  To conclude that, simply because it is impermissible for hospitalization to take longer than four months, it is also unreasonable for the logistical and administrative pre-hospitalization procedures to take longer than four months -- in the absence of any statutory provision indicating this period to be Congress' intent -- is to ignore the Supreme Court's warning that "'it is at best treacherous to find in congressional since alone the adoption of a controlling rule of law.'"  United States v. Wells, 519 U.S. at 496 (quoting Nat'l Lab. Rels. Bd. v. Plasterers' Local Union No. 79, 404 U.S. at 129-130 (1971)).  While the Court recognizes that long wait times for hospitalization are a significant problem, in the face of Congressional silence, it must be cautious to avoid "insert[ing] convenient language to yield the court's preferred meaning."  Borden v. United States, 141 S. Ct. at 1829 (2021).

III.    **EVEN IF THERE WERE A VIOLATION OF 18 U.S.C. § 4241(d) OR DELORME'S DUE PROCESS RIGHTS, DISMISSING THE INDICTMENT OR EXPEDITING TRANSFER WOULD BE AN INAPPROPRIATE AND UNWORKABLE USE OF THE COURT'S SUPERVISORY POWER.**

The Court concludes that, even if there were a violation of 18 U.S.C. § 4241 or of Delorme's due process rights, dismissal -- the remedy Delorme seeks -- would be an inappropriate use of the Court's supervisory power.  First, the Court concludes that, because § 4241 is silent as to remedies, ordering dismissal or expedited transfer would be inappropriate.  As part of its analysis, the Court examines Donnelly and United States v. Lara to elucidate the issues with granting relief which Congress does not authorize in § 4241.  Finally, the Court discusses the practical impact of a dismissal or expedited transfer remedy, and concludes that they are

unworkable and do not fix the underlying problem of BOP delays.

A.      BECAUSE 18 U.S.C. § 4241 IS SILENT AS TO REMEDIES, ORDERING
        DISMISSAL OR EXPEDITED TRANSFER IS AN INAPPROPRIATE USE
        OF THE COURT'S SUPERVISORY POWER.

Having interpreted 18 U.S.C. § 4241(d)'s plain meaning, the Court concludes that

Congress chose not to empower courts to dismiss an indictment -- which Delorme requests -- or

expedite transfer as remedies for violations of the statute or a defendant's due process rights in the

§ 4241(d) context.  First, the Court looks to the statute's text, which contains no remedy provisions.

As the Ninth Circuit notes correctly in Donnelly, for violations of § 4241(d), "dismissal is not the

appropriate remedy," because "Congress did not prescribe dismissal of the indictment as a remedy

for violation of the time limits imposed by § 4241(d), as it has, for example, in the context of

violations of time limits imposed by the Speedy Trial Act."  Donnelly, 41 F.4th at 1106 (citing

18 U.S.C. § 3162(a)).  Indeed, unlike the Speedy Trial Act, which provides that violations of its

time limit result in charges against a defendant being "dismissed or otherwise dropped," 18 U.S.C.

§ 3162(a), § 4241 does not include a similar command for violations of its four-month time limit.

Compare 18 U.S.C. § 3162(a), with 18 U.S.C. § 4241.  Congress knows how to create a remedy

for a violation of a statutory time limit, but chose not to create one in § 4241.  See, e.g., Touche

Ross & Co. v. Redington, 442 U.S. 560, 572 (1979)(examining statutory scheme and noting that,

"when Congress wished to provide a private damage remedy, it knew how to do so and did so

expressly.");  United States v. Rodriguez-Lopez, No. CR 08-2447, 2010 WL 4339282, at *7 n.5

(D.N.M. September 22, 2010)(Browning, J.)(holding that, because "Congress knew how to impose

a higher burden of evidence," but choose not to impose a higher standard, the "most reasonable

reading of the language of the statute is that Congress intended preponderance of the evidence to

be the standard").  An intentional omission of a remedy from a statute is a "['] single sound reason

to defer to Congress,'" which "is enough to require a court to refrain from creating such a remedy."
Egbert v. Boule, 142 S. Ct. at 1803 (quoting Nestlé USA, Inc. v. Doe, 141 S. Ct. at 1937).  The
Court, therefore, must not "insert convenient language" to imply a remedy where Congress did not
provide one.  Borden v. United States, 141 S. Ct. at 1829.  Accordingly, on the basis of this plain-
language analysis, the Court concludes that dismissal is not an appropriate remedy for violations
of § 4241(d) or a defendant's due process rights in the § 4241(d) context.

Given the absence of statutory authority for the dismissal remedy in § 4241, the Court does
not endorse the approach that some courts have taken to "craft an appropriate remedy."  Donnelly,
41 F.4th at 1106.  In Donnelly, while the Ninth Circuit rightly acknowledged that dismissal is not
an appropriate remedy, because, unlike in the Speedy Trial Act, 18 U.S.C. § 3162(a), Congress
chose not to include a dismissal remedy in § 4241, it nonetheless left the door open for the
dismissal, noting that "dismissal may become appropriate at a future date, either in this case or in
others like it."  Donnelly, 41 F.4th at 1106, 1107.  As a first step, the Ninth Circuit -- again, in the
absence of a remedy in § 4241(d)'s text -- ordered that the defendant's hospitalization be expedited,
i.e., that he be placed in a suitable facility within seven days.  See 41 F.4th at 1107.  The Ninth
Circuit warned, however, that, "should the Attorney General fail to comply with the district court's
order on remand" to expedite hospitalization, "that court may consider whether such a failure --
layered on top of the existing statutory violation -- leaves available 'no lesser remedial action' than
dismissal."   41 F.4th at 1107 (quoting United States v. Bundy, 968 F.3d 1019, 1031 (9th
Cir. 2020)(quoting United States v. Chapman, 524 F.3d 1073, 1087 (9th Cir. 2008))).  It is not
clear from Donnelly whether the Ninth Circuit would consider the Attorney General's not heeding
the order to expedite hospitalization a due process violation or a violation of § 4241, although the
Ninth Circuit notes that, for a due process violation, dismissal requires "'grossly shocking and

outrageous' government misconduct," a standard to which the pre-hospitalization delay itself did not rise.  Donnelly, 41 F.4th at 1107 n.3 (quoting United States v. Bundy, 968 F.3d at 1031; United States v. Kearns, 5 F.3d at 1253).  Further, the Ninth Circuit acknowledges that, even in Jackson, which involved a defendant who was committed pre-trial for over three years, the Court declined to order dismissal.  See Donnelly, 41 F.4th at 1107 n.3 (citing Jackson, 406 U.S. at 738)).  It is not clear from Donnelly whether the BOP effectuated transport within seven days and, if it did not, whether the district court ultimately ordered dismissal.

Whatever ultimately happened in Donnelly, other courts took note of its two-step approach, which involves first ordering expedited transport within seven days and, if the BOP does not transport the defendant in time, ordering the indictment against the defendant dismissed.  See 41 F.4th at 1107.  Indeed, in United States v. Lara, Judge Garcia implemented the Donnelly two-step approach for the first time in this District, going beyond the Ninth Circuit by ordering dismissal.  See United States v. Lara, 2023 WL 3168646, at *7 (ordering expedited transport within seven days); United States v. Lara, 2023 WL 3316274, at *2 (ordering dismissal as "[t]he only solution that remains" after the BOP did not expedite the defendant's transport); United States v. Lara, No. CR 21-1930, 2023 WL 3304284, at *3 (D.N.M. May 8, 2023)(Garcia, J.)(denying emergency motion for reconsideration or stay of dismissal).  Discussing the Donnelly line of cases, Judge Garcia notes that § 4241 "does not expressly provide a remedy for violations arising from the failure to comply with [its] various provisions," but that "decisional authority upholds the district court's power to fashion relief," before proceeding to discuss the cases in which courts have expedited transport or dismissed an indictment.  United States v. Lara,  2023 WL 3168646, at *6.  Judge Garcia concludes, even in the absence of a remedy in § 4241, that, "[b]ased on the Supreme Court's holding in *Jackson* and on the supervisory power of district courts, the Court finds that it

may act to redress the constitutional violation at issue." 2023 WL 3168646, at *6. Discussing orders to expedite transport, Judge Garcia expressed "some ambivalence about the merits of such an order," noting that "[o]rdering Defendant to jump the line would only contribute to the delays for other defendants who may have been waiting similar lengths of time, a troubling result in the larger context of the delays may defendants are facing." 2023 WL 3168646, at *6. As to dismissal, Judge Garcia notes that, although the Ninth Circuit in Donnelly described it as an "'extreme sanction,'" dismissal "nevertheless strikes the Court as warranted given the operative facts." United States v. Lara, 2023 WL 3168646, at *6 (quoting Donnelly, 41 F.4th at 1107). Although Judge Garcia was "inclined to dismiss the indictment, which would resolve the issue cleanly," he first chose to implement the initial Donnelly step, "warn[ing] the United States in no uncertain terms that if the Defendant is not admitted to FMC Butner or a suitable facility within seven days of the entry of this order, dismissal of the indictment is highly likely to follow." 2023 WL 3168646, at *7. The United States did not transport the defendant to a suitable facility within seven days, and, accordingly, Judge Garcia dismissed the indictment without prejudice, noting that, although "[d]ismissal is a harsh outcome," it is "the only solution that remains." United States v. Lara, 2023 WL 3316274, at *2.

The Court respectfully disapproves of the Donnelly two-step approach to remedies which Judge Garcia implements in United States v. Lara, because Congress has not empowered courts to expedite transport or to dismiss an indictment through a grant of statutory authority in § 4241, and, accordingly, granting those remedies is not a responsible use of "the supervisory power of district courts," United States v. Lara, 2023 WL 3168646, at *6, or, as Donnelly puts it, "supervisory authority to order the government to rectify violations of law with remedies shaped to redress the corresponding injury," 41 F.4th at 1107 (citing United States v. Bundy, 968 F.3d at 1031). The

Tenth Circuit states that district courts may dismiss an indictment through use of their supervisory powers in order to "deter[] illegality and protect[] judicial integrity." United States v. Kilpatrick, 821 F.2d 1456, 1465 (10th Cir. 1987). Further, "[t]he remedy of dismissal of an indictment . . . is an extraordinary one . . . applied to insure proper standards of conduct by the prosecution." United States v. Pino, 708 F.2d 523, 530 (10th Cir. 1983). Indeed, the "extraordinary" dismissal remedy is more appropriately applied to deter prosecutorial misconduct, specifically that which "is flagrant to the point that there is some significant infringement on the grand jury's ability to exercise independent judgment," than to force an agency like the BOP -- which has a non-prosecutorial function -- to accelerate its transporting defendants for hospitalization. United States v. Pino, 708 F.2d at 530. Dismissal punishes and sanctions the wrong entity; the United States Attorney's Office cannot accelerate transport. The Court disapproves, in the absence of a clear grant of statutory authority to impose a remedy under § 4241, of courts falling back on their supervisory authority to impose the "extreme sanction" of a dismissal remedy. Donnelly, 41 F.4th at 1107. In the absence of a clear grant of statutory authority, Courts should exercise their supervisory power with caution. To dismiss an indictment in response to a transport delay under § 4241(d) or a due process violation in the § 4241(d) context is to dispense with judicial restraint. It is far better, when considering whether to grant such an extraordinary remedy, to proceed with a sense of humility as to the judicial role.

### B.   EVEN IF ORDERING DISMISSAL OR EXPEDITED TRANSPORT WERE JUSTIFIABLE USES OF THE COURT'S SUPERVISORY POWER, THEY ARE UNWORKABLE REMEDIES THAT WILL NOT FIX THE UNDERLYING PROBLEM OF BOP DELAYS.

Even if it were a reasonable exercise of supervisory power to apply a dismissal remedy in cases like Delorme's, dismissal would be an inappropriate and counterproductive choice. Dismissing an indictment for a delay under the Speedy Trial Act is appropriate, because the United

States is responsible for "set[ting] the case for trial on a day certain, or list for trial on a weekly or other short-term trial calendar at a place within the judicial district, so as to assure a speedy trial." 18 U.S.C. § 3161(a).  Dismissal with prejudice for failure to comply with the Speedy Trial Act is a powerful motivational tool that sends "a strong message to the Government that unexcused delays will not be tolerated."  United States v. Taylor, 487 U.S. 326, 343 (1988).  A dismissal for a delay under § 4241(d) lacks the same deterrent effect.  The cause of Delorme's transportation delay is "limited staffing, resources, and bed availability" in BOP facilities, and not a failure on the part of the United States Marshals Service or the United States Attorney's Office.  Study Order at 2.  Dismissing the Indictment in Delorme's case would do nothing to "encourage the expeditious operation of the judicial machinery," because it is not the judicial machinery that is causing the delay.  United States v. Scalf, 760 F.2d 1057, 1060 n.2 (10th Cir. 1985)(citing United States v. Iaquinta, 674 F.2d 260, 264 (4th Cir. 1982)).  The messy procedural posture of United States v. Lara shows that giving these orders does not get the defendant to the appropriate facility any sooner and, in fact, may delay the defendant's arrival considerably.  The Court looks also to the Supreme Court's exclusionary-rule jurisprudence -- which, at its core, focuses on deterring bad conduct by government actors -- to conclude that inserting a dismissal remedy into § 4241(d) that penalizes the United States would not serve to deter future delays, because it is not the United States Marshals Service or United States Attorney's Office's fault that Delorme experienced transport delays.  See United States v. Leon, 468 U.S. 897, 921 (1984)(noting, in the exclusionary-rule context, that "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations").  That Delorme's transport delay is not the product of a government entity's bad faith further weighs against the imposition of a dismissal remedy.  See United States v. Christy, 785 F. Supp. 2d 1004, 1003 (D.N.M.

2011)(Browning, J.)(noting, in the exclusionary-rule context, that, "in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant" (citing United States v. Tuter, 240 F.3d 1292, 130)(10th Cir. 2001)).

In any event, to dismiss Delorme's indictment without prejudice would extend, rather than shorten, his wait for treatment.  While dismissing the case without prejudice "imposes a cost on the parties and the Court, because they have to once again expend limited resources on a second case, and divert attention from other priorities," this burden will do nothing to alleviate the delay Delorme will face if re-prosecuted.  United States v. Hernandez-Mejia, 778 F. Supp. 2d 1108, 1121-22 (D.N.M. 2011)(Browning, J.).  The practical effect of dismissing the case without prejudice would be to burden the United States by forcing it to bring a second suit, which might take Delorme out of his current place on the list awaiting transport and push him to the bottom of the list.  This solution fails to fix the problem, wastes government resources, and further delays Delorme's potential treatment.  Even if a violation of § 4241(d) occurred, dismissing the case against Delorme would be an inappropriate remedy under the statute.

Expediting transport, while a less extreme imposition than dismissing an indictment, is unworkable, inequitable, and does nothing to fix the underlying systemic problem causing hospitalization delays in the first place.  The Court agrees with Judge Garcia's discussion in United States v. Lara on the problems associated with ordering expedited transport:

> The Court has some ambivalence about the merits of [an expedited transport order].  Certainly, Defendant has waited far too long for an available bed, and he is deserving of immediate admission to FMC Butner.  On the other hand, a court order of the type issued in *Donnelly* and *Leusogi* would essentially direct the Attorney General to jump the line for Defendant's admission to FMC Butner.  The practical result is a disruption in the flow of patients to FMC Butner (and possibly other facilities).  In fact, it is the Court's understanding that Defendant would have been admitted to FMC Butner on April 18, 2023, if not for others who were considered

more urgent cases -- that is, others who may have also received an order for
admission within seven days or a similarly brief timeframe . . . .   Ordering
Defendant to jump the line would only contribute to the delays for other defendants
who may have been waiting similar lengths of time, a troubling result in the larger
context of the delays many defendants are facing.

United States v. Lara, 2023 WL 3168646, at *6.  Expediting transport does not set a manageable

standard for future delays in transport under § 4241(d)(1).  Ordering the Attorney General to

expedite Delorme's transport, as occurred in Donnelly, 41 F.4th at 1108, would not solve the

underlying systemic issue causing the BOP delays, and is only a short-term solution for one

defendant which exacerbates the problem by increasing the length of time that other defendants

must wait.  See United States v. Lara, 2023 WL 3168646, at *6 ("Ordering Defendant to jump the

line would only contribute to the delays for other defendants who may have been waiting similar

lengths of time, a troubling result in the larger context of the delays many defendants are facing.").

This solution is unmanageable when applied broadly.  If it were possible for the Attorney General

to expedite the transfer of every defendant, the Attorney General would have already done so, and

there would be no delay in the first place.[16]

---

[16]Similarly, the Court does not consider holding the Attorney General in contempt to be an
appropriate or workable remedy.  The Court has ordered the Attorney General to transport Delorme
to a suitable medical facility.  See Further Treatment Order at 2.  The Further Treatment Order
does not state a time period or deadline for when the transportation has to take place.  The form of
Further Treatment Order was one that the United States prepared and Delorme approved.  See
Further Treatment Order at 4.  Thus, the delay in transporting Delorme cannot be seen as a failure
to perform a "specific act . . . within the time specified," warranting holding the Attorney General
in civil contempt.  Fed. R. Civ. P. 70.  The practical effect of a contempt order would not differ
meaningfully from ordering that Delorme's transport be expedited.  The Court is empowered only
to fine a contemnor, imprison him or her, or some combination of both, pursuant to a contempt
order.  See 18 U.S.C. § 401.  The Court is not going to put the Attorney General in jail or fine him.
The purpose of imposing these sanctions on a party held in civil contempt is to motivate
compliance with the Court's order.  See Dartez v. Peters, 759 F. App'x at 690.  A criminal
contempt order's primary purpose "is to punish defiance of a court's judicial authority." Ager v.
Jane C. Stormont Hosp. & Training Sch. for Nurses, 622 F.2d at 499-500 (citing Norman Bridge
Drug Co. v. Banner, 529 F.2d at 822).  Whether civil or criminal, the consequences of a contempt
order would be same as those of an order to expedite transportation: Delorme's transport to a

The Court should be reluctant to put its defendant in front of the line.  The Court has no information about all the defendants who are awaiting hospitalization and no expertise to evaluate which defendants should be permitted to skip the queue for hospitalization.  The BOP, on the other hand, prioritizes defendants, depending on the exigency of their needs.  See United States v. Wesley, 60 F.4th 1277, 1285 (10th Cir. 2023).  Judges, as well as probation officers, are free to write to the BOP, state the reasons for prioritization, and urge prioritization.  For the Court to take one defendant to the front of the line, without considering all other defendants in the nation, is an unjustified use of raw judicial power that lacks a sound basis in statutory authority or the facts of this case.  The Court declines to use its judicial power to put Delorme at the front of the line without a robust record indicating that he deserves such preferential treatment.  Delorme has not put forth such a record.  Even if Delorme had put forth a robust record, the Court lacks the expertise to evaluate that record and decide that he should be placed at the front of the line.

**IT IS ORDERED** that the Motion to Dismiss Indictment, filed September 29, 2022 (Doc. 46), is denied.

---

suitable facility might accelerate, but other defendants would experience greater delay.  Holding the Attorney General in contempt for every defendant experiencing a delay is an unworkable solution.  In any event, the defendant before the Court may not be the defendant most entitled to be pushed to the front of the line.

The contempt power does not provide an avenue for the Court to solve the systemic problem of transport delays, as it limits the Court to fining an individual, imprisoning him or her, or both.  See 18 U.S.C. § 401.  The contempt power cannot force the BOP to hire more staff to prevent future delays or to force Congress to build more facilities to accommodate the large number of prisoners awaiting transport.  Even if the contempt power could force a solution to this problem, the Court should be hesitant to make a decision in an area in which it lacks expertise.  See Georgacarakos v. Wiley, No. CV 07-01712, 2008 WL 4216265, at *21 (D. Colo. September 12, 2008)(Krieger, J.)("The BOP is entitled to a high degree of discretion with regard to placing prisoners . . . .  [C]ourts must be reluctant to meddle in that discretion.").  The Court does not have the expertise to determine which defendants in the United States should be pushed to the front of the line.  The Court declines to draft a civil contempt order for the Attorney General, who does not have the resources to do more than he is doing.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M. M. Uballez
    United States Attorney
Kimberly N. Bell
    Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Margaret Katze
    Federal Public Defender
Emily P. Carey
    Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

        *Attorneys for the Defendant*